In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-4244

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MATTHEW R. SCHUSTER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 04 CR 175—**Barbara B. Crabb**, *Chief Judge.*

ARGUED SEPTEMBER 26, 2006—DECIDED OCTOBER 27, 2006

Before BAUER, EASTERBROOK, and ROVNER, *Circuit Judges.*

BAUER, *Circuit Judge.* Matthew Schuster pleaded guilty to intentionally accessing and recklessly causing damage to a protected computer in violation of 18 U.S.C. § 1030(a)(5)(A)(ii). He was sentenced to fifteen months imprisonment and ordered to pay $19,060 in restitution. Schuster appeals his sentence, arguing that the district court erred in calculating both the loss amount resulting from the offense and the amount of restitution. We affirm Schuster's sentence.

## I.  Background

From 2000 until his termination, Schuster worked as a computer technician for Alpha Computer Services, Wausau, Wisconsin ("Alpha"). As an Alpha employee, Schuster provided computer technical support to Central Wisconsin Wireless Internet Services ("CWWIS"), a Wausau-area wireless internet service provider, and its customers. He was also a paying customer of CWWIS, using CWWIS's service for his home computer.

On May 14, 2003, Alpha terminated Schuster for refusing to provide technical support to a CWWIS client. The same day, CWWIS sent Schuster a registered letter informing him that it had terminated his CWWIS wireless internet access and refunded the balance of his monthly payment.

Schuster continued to access CWWIS wireless network with his home computer, however, by using the internet access information of various CWWIS customers: T.D. Fischer Group, Riverbend Properties, the Wausau/ Central Wisconsin Convention & Visitors Bureau, and Straight Shot Express. By connecting to CWWIS's network with the internet access information of these companies, Schuster disrupted their wireless internet connection, which adversely affected their productivity. Schuster continued his unauthorized use of CWWIS's network until October 6, 2003, when a police officer who was executing a search warrant at Schuster's house disconnected his computer.

A federal grand jury returned a two-count indictment against Schuster on October 27, 2004. Count I charged Schuster with violating 18 U.S.C. § 1030(a)(5)(A)(I) by knowingly causing the transmission of a code, program, command, or information to a protected computer used in interstate commerce and communication and intentionally causing damage of at least $5,000 to the computer and to the computer's user and customers. Count II

charged Schuster with violating 18 U.S.C § 1030(a)(5) (A)(ii) by intentionally accessing a protected computer used in interstate commerce and communication without authorization and recklessly causing damage of at least $5,000 to the computer and its user and customers.

On May 13, 2005, Schuster pleaded guilty to count II, conceding that the criminal conduct occurred between September 1, 2003 and October 6, 2003. He acknowledged that the government could prove at trial that he accessed the CWWIS system, a protected system, without authorization. He further conceded that his access of the CWWIS system caused damage by impairing the availability of the CWWIS system to its customers and impairing the availability of information over the CWWIS network to their customers. Schuster also agreed to pay restitution and all losses covered by the same course of conduct or common scheme or plan as the offense of conviction.

At the sentencing hearing, the district court considered and rejected several objections raised by Schuster to the Pre-Sentence Investigation Report ("PSR"), finding that the loss amount and restitution amount were both $19,060. The district court determined that Schuster's total offense level was fourteen and the guideline imprisonment range was fifteen to twenty-one months. The district court then sentenced Schuster to fifteen months in prison to be followed by three years of supervised release and ordered him to pay $19,060 in restitution. This timely appeal followed.

## II. Analysis

Schuster appeals the district court's determination of both the loss amount and amount of restitution. He argues that the loss amount should be below $10,000, which would result in an offense level of twelve and a guideline range of

ten to sixteen months imprisonment. Schuster contends that the district court erred by including in its calculation of the loss amount (1) $5,850 for T.D. Fischer Group based on lost productivity for approximately five days; (2) $164 that T.D. Fischer Group spent to switch internet providers; (3) $2,700 for travel by victims to meet with the FBI; and (4) $1,400 for two victims to testify at the sentencing hearing on behalf of the government. He also asserts that the amount of restitution should be $13,046, not $19,060, because the government failed to meet its burden of proving by a preponderance of the evidence that Schuster's actions caused T.D. Fischer Group to lose $6,014.

Our review of a district court's sentencing decision is deferential. We review the district court's assessment of the amount of loss for clear error and will reverse "only if the district court's calculation evokes 'a definite and firm conviction that a mistake has been made.'" *United States v. Schaefer*, 291 F.3d 932, 936-37 (7th Cir. 2002) (quoting *United States v. Vivit*, 214 F.3d 908, 914 (7th Cir. 2000)). The meaning of "loss" under the sentencing guidelines, however, is a question of law that we review *de novo*. *Vivit*, 214 F.3d at 914.

### A.  T.D. Fischer Group's Loss of $6,014

Schuster challenges the district court's inclusion of T.D. Fischer Group's entire claim for $9,524 in its calculation of the actual loss amount, arguing that this amount should be reduced by $6,014: $5,850 based on T.D. Fischer Group's lost productivity preceding October 1, 2003 and $164 for its costs in switching internet providers. He asserts that the government failed to prove by a preponderance of the evidence that he was responsible for T.D. Fischer Group's lost productivity and associated costs. We find that the district court did not clearly err in including the $6,014 in its calculation of the loss amount attributable to

Schuster's conduct and affirm the district court's order of restitution in the amount of $19,060.

At the sentencing hearing, the district court heard testimony from two witnesses: Curt Brodjieski, who testified on behalf of Alpha and CWWIS, and Robert Fischer, who testified on behalf of T.D. Fischer. Both witnesses testified regarding the existence of technologically unexplainable problems with CWWIS's internet service and T.D. Fischer Group's internet connection. They testified that these problems were consistent with Schuster's use of T.D. Fischer's internet access information. These problems arose before September 30, 2003 and ended once Schuster's equipment was removed from his home in connection with the search warrant. Such evidence was sufficient to raise the reasonable inference that Schuster had caused the inexplicable problems before October 1, 2003.

This inference is bolstered by Schuster's threats of causing interference with the services delivered by Alpha and CWWIS. The PSR reported that Schuster had telephoned an Alpha employee on October 2, 2003 and, during the course of the conversation, informed the Alpha employee that he was leaving his home's wireless antenna and equipment "plugged in" to harass Alpha and CWWIS. Later, while playing an on-line game, Schuster wrote in a "chat" session with other game players that he was experiencing a poor wireless connection because he was not on any internet service provider's customer list. He explained that the provider was making encryption changes and that he was having difficulty keeping up with these changes. Schuster then wrote that he needed to find a way to broadcast interference from his wireless antenna "just to fuck with them." The following day, October 3, 2003, Schuster ran a "Google" search over CWWIS's network using the following search terms: "how to broadcast interference over wifi 2.4 GHZ," "interference over wifi 2.4 Ghz,"

"wireless networks 2.4 interference," and "make device interfere wireless network."

The inference that Schuster caused the pre-October 1, 2003 problems is supported further by the existence of "denial of service attacks" against CWWIS's customers throughout the summer. The PSR reported that Brodjieski had received a customer complaint on October 3, 2003 that the customer's website was down. Brodjieski investigated the computer that hosted that company's website. He discovered that the computer was under a "denial of service attack," which, in this instance, had occurred because the computer was overwhelmed with information or requests and could not keep up with the demand. Brodjieski had encountered similar denial of service attacks during the summer. Aware that Schuster was connected to CWWIS's network, Brodjieski terminated Schuster's connection and saw that the denial of service attack had ended.

Schuster argues, however, that the district court's finding that he was responsible for problems occurring before October 1, 2003 was contrary to the evidence. He asserts that from the day he was fired until September 30, 2003, he used CWWIS's internet service like any other customer by using the same "MAC address"[1] and "IP address"[2] that CWWIS had given him as a paying customer. In support of this assertion, Schuster points to Brodjieski's testimony at the sentencing hearing that Schuster had continued to use the same MAC address that he had been assigned previously by CWWIS before CWWIS terminated his access to the service on September 30, 2003. Brodjieski's testimony,

---

[1] A "MAC address," or media access control address, is a unique number assigned to the hardware of a particular computer or other device.

[2] An "IP address," or internet protocol address, identifies a computer or device attached to a network.

however, is not evidence that Schuster *only* used the MAC address that CWWIS had assigned him. Moreover, this testimony fails to substantiate Schuster's claim that he used the same IP address.

Schuster was caught using the MAC addresses of T.D. Fischer Group, Straight Shot Express, and others between September 30 and October 6, 2003. Only after CWWIS terminated the MAC address and IP address that it had assigned to him as a paying customer did Schuster go so far as to access and password-protect the wireless antennae that these companies used to access CWWIS's wireless network. In taking these steps, Schuster gave himself exclusive use of these businesses' MAC addresses. In light of such evidence, it was not unreasonable for the court to infer that Schuster had used the MAC addresses of these companies before October 1, 2003, even if he had used his previously assigned MAC address as well. Thus, the district court did not clearly err in holding Schuster responsible for attacks occurring before October 1, 2003 and the $5,850 in costs associated with these attacks.

In a similar vein, Schuster argues that the district court erred in including in its calculation of the loss amount the $164 that T.D. Fischer Group had spent to switch internet providers. T.D. Fischer Group had begun to look for a different internet provider approximately two months before October 3, 2003. Schuster therefore contends that his conduct in September and early October 2003 had nothing to do with T.D. Fischer Group's decision to change to a different internet provider. As explained above, however, the district court did not clearly err in holding Schuster responsible for T.D. Fischer Group's internet connection problems arising before October 1, 2003, including the inexplicable technological problems that it had experienced prior to September 30, 2003. As such, the district court did not clearly err in attributing to Schuster's conduct the need of T.D. Fischer Group to find a different

internet provider and its payment of $164 to change internet providers. Because the district court did not err in including the $6,014 in its loss calculation, we also affirm the district court's order of $19,060 in restitution.

**B. Losses of $2,700 and $1,400 for Assisting Government**

Finally, Schuster challenges the district court's inclusion in its calculation of the loss amount $2,700 in costs for two victims' meetings with the FBI during the course of the FBI's investigation of Schuster and $1,400 in costs for two victims to testify on behalf of the government at the sentencing hearing. Schuster argues that such costs are excluded from the loss calculation under the sentencing guidelines. In response, the government asserts that Schuster waived or forfeited his argument regarding the $1,400 by failing to object to its inclusion in the loss calculation at the sentencing hearing. We need not decide whether Schuster adequately preserved this argument because the point is academic. The district court's inclusion of both the $2,700 and $1,400 in its calculation of the loss amount did not affect the offense level, and we conclude that the same sentence would have been imposed irrespective of whether the loss calculation excluded these amounts.

Under U.S.S.G. § 2B1.1(b), loss is to be calculated as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, application note 3(A). "Actual loss" under the sentencing guidelines, "means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, application note 3(A)(i). "Intended loss," by contrast, is "the pecuniary harm that was intended to result from the offense," including the "intended pecuniary harm that would have been impossible or unlikely to occur . . . ." U.S.S.G. § 2B1.1, application note 3(A)(ii). Additionally, in

cases involving fraud and related activity in connection with computers, the sentencing guidelines include in the calculation of actual loss, regardless of whether such pecuniary harm was reasonably foreseeable,

> any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other damages incurred because of the interruption of service.

U.S.S.G. § 2B1.1, application note 3(A)(v)(III). The commentary to the sentencing guidelines expressly excludes from loss calculations "[c]osts to the government of, and costs incurred by victims primarily to aid the government in, the prosecution and criminal investigation of an offense." U.S.S.G. § 2B1.1, cmt. n.3(D)(ii).

Schuster notes that the imperatives contained in application note 3(A)(v)(III) and commentary note 3(D)(ii) to U.S.S.G. § 2B1.1 appear to conflict with one another. On the one hand, the commentary is explicit in its exclusion from the loss calculation those costs associated with assisting the government in investigating and prosecuting an offense. On the other hand, application note 3(A)(v)(III) allows victims of computer-related fraud and similar activity to recover "any reasonable cost." He argues that under basic principles of statutory construction, this apparent conflict is readily resolved in favor of excluding from the loss calculation those costs attributable to assisting the government, even for offenses involving computer-related fraud and similar activity. We agree.

Courts must interpret the sentencing guidelines "so no words are discarded as meaningless, redundant or surplusage." *United States v. Arnaout*, 431 F.3d 994, 1001 (7th Cir. 2005) (citing *Witzke v. Femal*, 376 F.3d 744, 753 (7th Cir. 2004)). Allowing victims to recover as "reasonable

costs" those costs primarily associated with their assistance of the government, even with regard to offenses in connection with computer-related fraud and similar activities, would render the commentary to § 2B1.1 meaningless. We cannot countenance such a result.

Additionally, losses associated with assisting the government are excluded from application note 3(A)(v)(III) to § 2B1.1 under the principle of *noscitur a sociis*, or "[i]t is known from its associates, the meaning of questionable words or phrases in a statute may be ascertained by reference to the meaning of words or phrases associated with it." *Ortloff v. United States*, 335 F.3d 652, 659 (7th Cir. 2003) (internal quotations and citation omitted). Application note 3(A)(v)(III) specifies the types of reasonable costs that are recoverable: "the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other damages incurred because of the interruption of service." U.S.S.G. § 2B1.1, application note 3(A)(v)(III). Such costs are those attributable to identifying and correcting the technological problems resulting from the offense. Costs associated with assisting the government, by contrast, are unrelated to these functions and, as a consequence, excluded from the purview of application note 3(A)(v)(III).

The $2,700 loss incurred by victims for their travel to an FBI office to meet with the FBI and assist with the FBI's investigation of the offense easily falls within the exclusion in the commentary to § 2B1.1. The victims incurred these costs while assisting the government in building its case against Schuster. The district court erred by including the $2,700 in its calculation of the loss amount. Whether the $1,400 loss falls within this exception is less obvious.

The $1,400 loss is attributable to the costs incurred by the victims in gathering documents to respond to Schuster's

subpoenas *duces tecum* and in testifying at the sentencing hearing. Neither Schuster nor the government allocates a percentage of this loss between responding to the subpoenas and testifying at the sentencing hearing. Instead, Schuster merely asserts that these victims testified favorably to the government at the sentencing hearing. We cannot conclude from this assertion that the victims incurred these costs *primarily* to aid the government in the prosecution and criminal investigation of an offense.

Even if we were to presume that the $1,400 loss was incurred by the victims primarily in their aid of the government, we agree with the government that the district court's inclusion of the $2,700 and $1,400 in its calculation of the loss amount was harmless. The loss amount exceeds $10,000 without the addition of either amount, resulting in the district court's proper application of an offense level of fourteen and guideline range of fifteen to twenty-one months. And the district court imposed the lowest possible sentence within the guideline range. Thus, we need not remand this case to the district court for resentencing because the record, as a whole, demonstrates that the asserted error did not affect the district court's selection of the sentence that it imposed. *See Williams v. United States*, 503 U.S. 193, 203, 112 S. Ct. 1112, 117 L.Ed.2d 341 (1992) (holding that a remand is only necessary if the sentence was "imposed *as a result of* an incorrect application" of the sentencing guidelines) (emphasis in original). *See also United States v. Saunders*, 129 F.3d 925, 932-33 (7th Cir. 1997).

### III.  Conclusion

For the foregoing reasons, we AFFIRM the sentence imposed by the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*