In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1613

IN RE:

TRANS UNION CORP. PRIVACY LITIGATION.


APPEAL OF:

DAWN A. WHEELAHAN.


Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 00 CV 4729 — **Robert W. Gettleman**, *Judge.*


ARGUED SEPTEMBER 23, 2013 — DECIDED JANUARY 23, 2014


Before BAUER, KANNE, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This appeal arises from an unusual class settlement for an estimated 190 million class members. Class settlements usually aim to impose a final and definitive resolution of a dispute, but this one did not. It offered class members certain benefits, including cash, in return for giving up only their right to sue the defendant through class actions or other collective actions. But the settlement left the door open for the vast majority of class

members to file individual suits against the defendant, the credit reporting company Trans Union.

One key detail has led to this appeal. The settlement created a fund of $75 million for class members' claims. It also allowed Trans Union itself to draw money from the fund as reimbursement for the cost of settling individual follow-on suits, termed "post-settlement claims" or "PSCs." There have been many more of these PSCs than anyone expected. Trans Union has settled them, and the district court has authorized Trans Union to reimburse itself from the fund. One of the class counsel, Dawn Wheelahan, has appealed. We affirm the district court's actions in all respects.

I.  *Factual and Procedural Background*

A.  *The Trans Union Litigation and Settlement*

Beginning in 1998, a number of consumer class actions were filed against Trans Union alleging that it had violated the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.,* by selling lists of consumer credit reports to target marketers (the "target marketing" claims) and sharing prohibited consumer information with companies that wanted to use the lists to extend offers of credit or insurance (the "firm offer" claims). In 2000, the Judicial Panel on Multidistrict Litigation transferred the cases to Judge Gettleman in the Northern District of Illinois for consolidated pretrial proceedings. A detailed account of the litigation's course over the following decade is not necessary here. We focus on the settlement and later disputes over the post-settlement claims or PSCs.

After preliminary rulings allowed the claims to go forward, Judge Gettleman asked Magistrate Judge Mason to mediate the entire dispute. To make a long story short, with his help the parties eventually reached an agreement that the district court approved as fair and reasonable. Trans Union agreed to give all class members "basic" in-kind relief in the form of credit monitoring services. In addition, class members could either claim cash from a $75 million settlement fund established by Trans Union or claim "enhanced" in-kind relief consisting of additional financial services. Trans Union agreed to provide roughly $35 million worth of enhanced relief. Five attorneys, including Wheelahan, were named as settlement class counsel.

While the deal gave significant relief to class members, court approval under Federal Rule of Civil Procedure 23(e) remained uncertain because the claims being settled had potential value far beyond what Trans Union proposed to pay. See *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006) (courts evaluating fairness of settlements generally must compare the value of the relief offered to the expected value of class claims before approving the deal); *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 284–86 (7th Cir. 2002) (same); American Law Institute, Principles of the Law of Aggregate Litigation § 3.05(a) & cmt. b (advising the same).

Class counsel sought to represent every consumer whose credit Trans Union had tracked since 1987. The class was estimated to include 190 million people, although that figure surely must have grown in the years since it was cited with alarm in a related case. *Trans Union LLC v. FTC*, 536 U.S. 915, 917 (2002) (Kennedy, J., dissenting from denial of certiorari in

FTC enforcement action against Trans Union). The Fair Credit Reporting Act authorizes statutory damages of between $100 and $1000 per consumer for willful violations, 15 U.S.C. § 1681n, meaning that Trans Union faced at least the theoretical possibility of $190 billion in liability. *Trans Union*, 536 U.S. at 917. There are many reasons, starting with Trans Union's net worth, why that astronomical number may not have been meaningful, but the stakes were far greater than the $75 million in cash that Trans Union was putting on the table.

As part of their effort to persuade the district court to approve the settlement and to narrow the gap between what Trans Union was offering and what it might owe, the parties agreed to an unusual feature that preserved class members' substantive claims even after settlement. Instead of releasing outright their claims against Trans Union, class members who did not ask for cash or enhanced in-kind relief would give up only their ability to sue as part of either a "Class Action" or an "Aggregated Action." Both terms were defined in the settlement, as explained below. These class members retained the right to bring their modest individual claims separately.

In exchange for class members agreeing not to proceed further on a class basis, Trans Union offered online credit monitoring to everyone in the class. Even those who accepted this "basic" in-kind relief were free to head straight back to court to file their claims, so long as they filed individually. We set aside for a moment whether it would make economic sense

for them to do so.[1] The statute of limitations, at least, would be no bar. Trans Union agreed to waive that defense for pending PSCs and those commenced within two years. Class members who pursued the additional option of claiming either monetary damages or enhanced in-kind relief, however, had to release their substantive claims against Trans Union.

Class members were not the only ones authorized to draw from the $75 million cash fund. The critical feature for purposes of this appeal is that the settlement authorized reimbursements from the fund—to Trans Union itself—"equal to any amounts paid to satisfy settlements or judgments arising from Post-Settlement Claims, not including any defense costs." Thus, Trans Union would bear any costs of defending PSCs but not the cost of settling them since it could reimburse itself for settlements from the $75 million it had already paid into the fund. The settlement put no restrictions on Trans Union's

---

[1] We recognize that giving up the right to pursue some form of collective action or other cost-sharing device will often mean that no relief is available. See *American Exp. Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304, 2309 (2013) ("the antitrust laws do not guarantee an affordable procedural path to the vindication of every claim"); *id.* at 2316 (Kagan, J., dissenting) (individual plaintiff's ability to pursue complex antitrust claim was foreclosed by contractual prohibitions on class arbitration, joinder/consolidation, cost-shifting, and other means of spreading expenses); *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1760–61 (2011) (Breyer, J., dissenting) (contract prohibiting class arbitration would likely "lead small-dollar claimants to abandon their claims" altogether). Class settlements that limit "only" class members' procedural options could extinguish their substantive rights as a practical matter. As we explain below, however, the settlement in this case did not foreclose outside lawyers from asserting and settling thousands of modest follow-on claims.

ability to settle these claims, expressly granting it the "option to settle any suit or pre-suit demand, or litigate any suit, involving Post-Settlement Claims." A committee of representatives selected in equal parts by Trans Union and class counsel would monitor PSC reimbursements, although any disputes would ultimately be settled by the court. Any money left in the fund after two years would be distributed among class members who had submitted timely claims for cash relief. (Approximately 450,000 class members did so.) The district court granted final approval of the settlement in September 2008.

B. *Post-Settlement Claims*

Enterprising lawyers not previously involved in the case then found an economically viable way to bring individual post-settlement claims against the $75 million fund. They solicited class members who had not sought money damages or enhanced in-kind relief and thus retained their target marketing and firm offer claims against Trans Union. These lawyers eventually gathered more than 100,000 PSCs. The more than 70,000 that were not merely informal demands to Trans Union were filed as substantially identical but formally separate individual lawsuits. Most were filed in Nueces County, Texas—presumably the jurisdiction with the lowest filing fee the lawyers could find. The remaining PSCs were filed in other low-fee jurisdictions.

The terms of the class settlement gave Trans Union little reason to fight these claims. It could settle them without paying one additional net dollar. The company struck deals with the post-settlement claimants and then sought to

reimburse itself from the fund. Class counsel objected. They argued that the PSCs filed in volume in low-fee jurisdictions like Nueces County were in fact "Aggregated Actions" prohibited under the settlement. The theory might have had some appeal under the term's ordinary meaning, but the settlement expressly defined "Aggregated Action." Its agreed meaning was "any action in which two or more individual plaintiffs assert claims relating to the same or similar alleged conduct." While the district court conceded that it "never contemplated such mass actions when it approved the settlement," it ruled that the high-volume PSCs were not covered by the settlement's definition because each claim was filed as a separate action on behalf of just one plaintiff. The claims were therefore not barred by the terms of the settlement. *In re Trans Union Corp. Privacy Litig.*, 2011 WL 918396 (N.D. Ill. Mar. 14, 2011).

For their efforts, the PSC attorneys received contingency fees of between 45 and 50 percent. In mid-2011, class counsel other than Wheelahan asked the district court for a share of the PSC attorney fees under the common-fund doctrine. See generally *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). Wheelahan did not join that request because she had already successfully pursued her own appeal for more fees based on her role in negotiating the original settlement. See *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741 (7th Cir. 2011). Trans Union responded in the district court by moving for final approval of its PSC settlements, which would resolve the bulk of the outstanding claims for around $35 million from the fund. In separate orders issued in August and September 2011, the district court denied class counsels' motion for common-

benefit fees and then approved the PSC settlements and Trans Union's reimbursement for them.

C. *The Prior Appeal*

Class counsel minus Wheelahan appealed both of those 2011 orders. The appeals were consolidated and Wheelahan joined in, representing her own view of the class's interests. We affirmed both orders in a terse non-precedential order. App. 11-3030 ECF 101.[2] With the reimbursement issue seemingly resolved, Trans Union paid on its provisional PSC settlements and moved the district court for a final order that would distribute the remainder of the fund and bring the litigation to an end. Judge Gettleman issued the order in February 2013. Wheelahan now appeals from that final order, as well as several interim orders approving reimbursements for PSCs.

II. *Analysis*

Wheelahan raises three issues on appeal in an effort to block reimbursement of Trans Union for settling the PSCs. First, she challenges the district court's final distribution order on the ground that it impermissibly modified the terms of the original settlement. Second, she asks us to reverse the district court's determination that the PSCs were not brought as prohibited class or aggregate actions. And third, she wants

---

[2] The order said in its entirety: "This appeal, successive to *In re Trans Union Corp. Privacy Litigtion*, 629 F.3d 741 (7th Cir. 2011), involves a conflict between class action lawyers over fees. We AFFIRM. The conflict was resolved by the district judge in an order based on an extended colloquy with the lawyers. We find no error in the order, or reason to enlarge on the judge's analysis."

Trans Union to reimburse the fund for money spent settling PSCs the company could have defeated at little cost because the claims were either barred by the statute of limitations or otherwise meritless.

We review *de novo* a district court's interpretation of a consent decree. *Bailey v. Roob*, 567 F.3d 930, 940 (7th Cir. 2009); *United States v. Krilich*, 303 F.3d 784, 789 (7th Cir. 2002). Our opinions have sometimes said that we will give an unspecified amount of deference to a district court's interpretation when that court has overseen the litigation for a long time and is familiar with the details of what may be a complex arrangement. See, *e.g.*, *Foufas v. Dru*, 319 F.3d 284, 286 (7th Cir. 2003) (dicta)*; United States v. Alshabkhoun*, 277 F.3d 930, 934 (7th Cir. 2002). This line of cases seems to have sprung from a footnote in a Sixth Circuit opinion simply recognizing the district court's view of a consent decree as one of a number of "relevant aids to contract interpretation." *Brown v. Neeb*, 644 F.2d 551, 558 n. 12 (6th Cir. 1981), cited in *United States v. Bd. of Educ. of City of Chicago*, 717 F.2d 378, 382 (7th Cir. 1983).

When the issue is one of case management, such deference is appropriate. When the issue involves reliance interests, however, with parties and especially with non-parties who may not have time or opportunity to ask a court to clarify an ambiguous order, it is less clear that we should defer to the authoring judge's interpretation. Litigants as well as third parties must be able to rely on the clear meaning of court orders setting out their substantive rights and obligations, and appellate courts should interpret those orders in the same manner. See *Mendez v. Republic Bank*, 725 F.3d 651, 663 (7th Cir. 2013) ("It is not reasonable to expect a third-party citation

respondent to investigate the intended meaning of a court order beyond the text of the order itself."). Because we would affirm the district court under ordinary *de novo* review, however, we need not decide the degree of deference here.

A. *Challenge to the Final Order*

We begin with Wheelahan's argument that the final distribution order impermissibly modified the original settlement by restricting her ability to raise objections on behalf of the class. As mentioned above, the settlement called for a committee composed of equal numbers of class counsel and Trans Union agents to receive quarterly reports concerning PSCs. Wheelahan is not a member of the committee, but she retained her status as one of the class counsel. She now objects to a provision in the final order in which the court recognized "the possibility that it may be required to resolve future disputes raised by any member of the Committee chosen by Settlement Class Counsel." Wheelahan contrasts this language with the original settlement, which said the court would address "Any dispute about the propriety of a reimbursement," including presumably one raised by a class attorney not on the committee. She argues that the new language will bar her from protecting the class's interests and that the district court lacked the authority to make such a change.

We do not see the conflict. Wheelahan retained her status as class counsel. Nothing in the final order limited her ability to fulfill her fiduciary responsibilities to the class, see Fed. R. Civ. P. 23(g)(4), even though she is not on the committee overseeing the post-settlement claims. The committee did not

displace class counsel and was never designated the sole advocate for the class, which makes sense since half its members were representatives of Trans Union. As we read the original settlement and the final order, any class counsel could bring an issue to the district court on behalf of the class.

B. *Challenges to Interim Orders*

More substantively, Wheelahan offers two reasons why Trans Union should not be reimbursed for all or some PSC settlements. First, she argues that the district court erred in approving settlements for PSCs that were in substance prohibited class actions. Her second argument is that Trans Union is not entitled to reimbursement for settling claims it could easily have defeated, either because they were clearly barred by the statute of limitations or meritless on their face. We discuss these arguments together here because they raise the same threshold issues of appellate procedure, though ultimately we find our way to the merits and agree with the district court. The terms of the settlement allowed Trans Union to find peace by settling arguably worthless claims from the $75 million settlement fund.

1. *Appellate Jurisdiction*

We have jurisdiction to hear Wheelahan's appeal from the final distribution order itself under 28 U.S.C. § 1291. Although the order acknowledged that the court might have to resolve residual disputes, it effectively concluded the litigation by distributing the remaining money and is final for purposes of § 1291. See *Ray Haluch Gravel Co. v. Central Pension Fund*, 134 S. Ct. —, No. 12-992, 2014 WL 127952, at *5 (Jan. 15, 2014); *Solis v. Current Dev. Corp.*, 557 F.3d 772, 775–76 (7th Cir. 2009). An

appeal from a final judgment encompasses review of earlier interlocutory rulings—even those that could have been the subject of an interlocutory appeal—so long as the issues decided in those rulings have not become moot. *Calma v. Holder*, 663 F.3d 868, 873 (7th Cir. 2011); *Habitat Educ. Center v. U.S. Forest Service*, 607 F.3d 453, 456 (7th Cir. 2010); 15A Wright & Miller, Federal Practice & Procedure § 3911 (2d ed.) ("The only consequences of forgoing a collateral order appeal opportunity should be the risk that further proceedings may moot the issue, and that in some circumstances the standard of review may be different" on appeal from a final judgment.). So no jurisdictional obstacles block our examination of the district court's orders concerning reimbursements.

### 2. *Effects of the Prior Appeal*

The procedural problem for Wheelahan is that the reimbursements she challenges were already the subject of the prior appeal before this court decided May 22, 2012. That was the consolidation of two appeals filed by Wheelahan's fellow class counsel. The first challenged the district court's denial of class counsels' motion for more fees in an order dated August 8, 2011. The second challenged a broader order dated September 8, 2011 in which the district court rejected all of class counsels' objections to the reimbursements and approved the PSC settlements in all respects.

Class counsel argued on appeal that the district court had erred in blessing Trans Union's reimbursements. Their main contention was that the court and Trans Union both were obliged to examine the fairness of the PSC settlements, and particularly the accompanying fee arrangements, before

paying from the settlement fund. Wheelahan joined the fray as an appellee, arguing that Trans Union was being reimbursed improperly for settling meritless PSCs. According to her, an FTC lawsuit had led Trans Union to stop selling lists of consumers to target marketers in 2001, yet PSC counsel were asserting target marketing claims on behalf of some consumers who had not entered Trans Union's database until after 2001 and thus could never have been victims of target marketing practices. She argued that this disqualified Trans Union from settling any such claims because they were certainly meritless.

Our decision affirming the district court, although brief, stated conclusively that we found "no error in the [district court's] order, or reason to enlarge on the judge's analysis." This language effectively adopted the reasoning of the district court's September 8, 2011 order and rejected all the appellants' arguments. See *Burlington Northern R.R. Co. v. City of Superior*, 962 F.2d 619, 620 (7th Cir. 1992) (per curiam).

Under these circumstances, Trans Union urges us not to consider the merits of Wheelahan's arguments in this appeal. Trans Union argues that we should apply the law of the case doctrine or find forfeiture. We see considerable merit in these procedural arguments, but neither the law of the case nor forfeiture is a rigid doctrine. Both allow this court some discretion in application. See *Creek v. Village of Westhaven*, 144 F.3d 441, 446 (7th Cir. 1998) (law of the case); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 391 (7th Cir. 2007) (forfeiture), *aff'd*, 553 U.S. 442 (2008); see also 18B Wright & Miller § 4478.2. Applying either doctrine here raises some delicate problems because of potential uncertainty about the scope of our prior decision and the complications that can arise when some

parties—in this case, Wheelahan's co-counsel—pursued an interlocutory appeal and others claimed to have reserved their right to appeal after a final judgment. See generally 18B Wright & Miller § 4478.6 (advising greater clarity in courts' application of overlapping but distinct doctrines of law of the case and forfeiture).

In applying either law of the case or forfeiture, the sound exercise of our discretion would lead us to look beyond the procedural obstacles to the merits of Wheelahan's arguments. We have done so here, and the arguments' lack of merit is so clear that we elect to bypass the law of the case and forfeiture doctrines. We simply affirm the district court on the merits.

### 3. *The Merits of the Remaining Objections*

We first address Wheelahan's argument that most of the PSCs that Trans Union settled were in truth prohibited class actions. This argument is based on *Bullard v. Burlington Northern Santa Fe Railway Co.*, 535 F.3d 759 (7th Cir. 2008), a case applying the Class Action Fairness Act provision that gives federal courts jurisdiction over certain types of mass actions. See 28 U.S.C. § 1332(d)(11). *Bullard* read the term "mass action" in a way that might encompass the PSCs here. But the fact that CAFA treats mass actions as class actions for purposes of federal jurisdiction does not mean that we should read the settlement's unambiguous definition of "Class Action" to incorporate a separate statutory definition of "mass action." For purposes of applying the settlement, the meaning agreed upon by the parties and approved by the district court is the one that counts. That definition reaches any action "brought by one or more individual plaintiffs on behalf of a

class of similarly situated persons." As explained above, each PSC was filed on behalf of one individual plaintiff rather than on behalf of a class of similarly situated claimants. None fall within the settlement's clear definition of "Class Action."

Wheelahan also asserts that Trans Union should not be reimbursed for settling PSCs it could have defeated at little cost, either because they were barred by the statute of limitations or were meritless. Wheelahan's claim concerning time-barred PSCs is based on the provision in the settlement that says Trans Union will waive the statute of limitations for PSCs commenced within two years. Wheelahan objects to reimbursing Trans Union for settling claims asserted outside the two-year window.

The argument overlooks language in the settlement that empowered Trans Union "to settle any suit or pre-suit demand" involving PSCs and to be reimbursed for "any amounts paid to satisfy" such settlements. Although the settlement required Trans Union to waive the statute of limitations in some instances, it did not require Trans Union to assert the defense in any. Nothing in the settlement would require Trans Union to assert all available defenses or to defend each arguably time-barred PSC to the death. The settlement gave Trans Union complete discretion to fold even a winning hand. The same reasoning applies to Wheelahan's argument that some PSCs included meritless targeting marketing claims. Trans Union was under no obligation to spend its own money to defend such claims rather than settle them. This argument also overlooks the fact that these claimants may have held valid firm offer claims even if their target marketing claims were extremely weak. We see no error

in the district court's order authorizing reimbursement for these settlements.

We AFFIRM both the final distribution order and the challenged interlocutory orders approving the PSC settlements and Trans Union's reimbursements for them.