In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 13-1232 and 13-1278

FREDERICK J. GREDE, not individually
but as Liquidation Trustee of the Sen-
tinel Liquidation Trust, Assignee of
certain claims,

*Plaintiff-Appellee, Cross-Appellant,*

*v.*

FCSTONE, LLC,

*Defendant-Appellant, Cross-Appellee.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 C 136 — **James B. Zagel**, *Judge.*

ARGUED DECEMBER 10, 2013 — DECIDED MARCH 19, 2014

Before MANION, ROVNER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Sentinel Management Group, Inc.,
was an investment management firm that filed for Chapter 11
bankruptcy protection on August 17, 2007. Sentinel was caught
in the midst of the credit crunch that heralded the beginning of
the financial crisis of 2008–09. The crunch Sentinel faced was

much worse because, it is now clear, Sentinel managers invaded for their own use the assets that Sentinel was legally required to hold in trust for its customers.

These appeals focus on two transfers of assets. In the days and even the hours just before the bankruptcy filing, Sentinel shifted assets around to increase dramatically the assets available to pay one group of its customers at the expense of another group. Then, on the first business day after the bankruptcy filing, Sentinel obtained the permission of the bankruptcy court to have its bank distribute more than $300 million from Sentinel accounts to the favored group of customers. As a result of these pre-petition and post-petition transfers, the customers in the favored pool have recovered a good portion of their assets from Sentinel, while those in the disfavored pool are likely to receive much less. For the benefit of the disfavored pool of customers, Sentinel's trustee in bankruptcy has sought to avoid both transfers under 11 U.S.C. §§ 547 and 549. Both transfers benefitted defendant FCStone, LLC, one of the customers in the favored pool, and both transfers to FCStone have been litigated as a test case. After a trial, the district court allowed the trustee to avoid both transfers. FCStone has appealed.

This case seems to be unprecedented, or at least unusual, in one important respect. Sentinel's managers violated federal commodities and securities law by invading not just one but two statutory trusts for customer assets, one under the Commodity Exchange Act and the other under the Investment Advisors Act. Those federal statutes, their accompanying regulations, and the two federal agencies charged with enforcing them were not enough to stop Sentinel managers

from removing securities from customer trust accounts and using them for their own gain. (Federal criminal charges are pending against two senior executives of Sentinel.) Two groups of customers (not to mention the rest of Sentinel's creditors) have been wronged, large amounts of money are at stake, and there are insufficient funds in the estate to make Sentinel's customers whole. Under these circumstances, there are no easy answers, and the courts face hard choices in applying bankruptcy law to the wreckage and the survivors.

The district court resolved the conflict between the two groups of wronged customers in an equitable way. The court "avoided" (a technical term meaning set aside) both the pre-petition and post-petition transfers so as to share the available assets as fairly as possible between the two groups who are similarly situated, apart from Sentinel's choices to favor one group over the other. *Grede v. FCStone, LLC*, 485 B.R. 854 (N.D. Ill. 2013). As we explain below, however, our review persuades us that there are insurmountable legal obstacles to the avoidance relief ordered by the district court. We therefore reverse as to both transfers.

With respect to the pre-petition transfer, the bankruptcy code provides for avoidance (sometimes also called a "clawback") of so-called preferential transfers made by an insolvent debtor in the 90 days before filing a bankruptcy petition. 11 U.S.C. § 547(b). The code has a broad exception from avoidance or clawback, however, for payments made to settle securities transactions. See 11 U.S.C. § 546(e). In this case, Sentinel's pre-petition transfer fell within the securities exception in § 546(e) and therefore may not be avoided.

The post-petition transfer of $300 million was authorized by the bankruptcy court. That authorization means that the post-petition transfer cannot be avoided under the express terms of 11 U.S.C. § 549. Although we do not reach all of the parties' arguments under § 549, in an effort to provide guidance to the district court for future related cases, we briefly discuss at the end of this opinion whether the post-petition transfer involved property of the bankruptcy estate.

I. *Factual Background*

The details of Sentinel's illegal practices and eventual collapse have been described well in the district court's findings in this case, *Grede v. FCStone, LLC*, 485 B.R. 854 (N.D. Ill. 2013), and by our court in a related case, *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660 (7th Cir. 2013), so we set out only the facts most relevant to these appeals.

Sentinel was an investment management firm that specialized in short-term cash management. Its customers included hedge funds, individuals, financial institutions, and futures commission merchants, known in the business as FCMs. Sentinel promised to invest its customers' cash in safe securities that would nevertheless yield good returns with high liquidity. Under the terms of Sentinel's investment agreement, a customer would deposit cash with Sentinel, which then used the cash to purchase securities that satisfied the requirements of the customer's investment portfolio. Customers did not acquire rights to specific securities under the contract, but rather received a *pro rata* share of the value of the securities in their investment pool. Sentinel prepared daily statements for customers that indicated which securities were in their

respective pools and the customers' proportional shares of the securities' value.

Sentinel classified all customers into segments depending on the type of customer and the regulations that applied to that customer. Sentinel then divided each segment into groups based on the type of investment portfolio each customer had selected. In all, Sentinel had three segments divided into eleven groups. For our purposes, we focus on two segments: Segment 1, which consisted of FCMs' customers' funds, and Segment 3, which contained funds belonging to hedge funds, other public and private funds, individual investors, and FCMs investing their own "house" funds. FCStone's funds were in Segment 1.

Both Segment 1 and Segment 3 accounts were subject to federal regulations requiring Sentinel to hold its customers' funds in segregation, meaning separate from the funds of other customers and Sentinel's own assets. Customer funds could not be used, for example, as collateral for Sentinel's own borrowing. The FCMs in Segment 1 were protected by the Commodity Exchange Act and related CFTC regulations, while Segment 3 customers were protected by the Investment Advisors Act and related SEC regulations. Both sets of regulations created statutory trusts requiring Sentinel to hold customers' property in trust and to treat it as belonging to those customers rather than to Sentinel. See 7 U.S.C. § 6d(a)–(b) (statutory trust under the CEA); 17 C.F.R. § 275.206 (statutory trust under the IAA).

Unfortunately for Sentinel's customers, their investment agreements with Sentinel and the federal regulations bore little relation to what Sentinel actually did with their money. Rather

than investing each segment's cash in securities for the segment, Sentinel lumped all available cash together without regard to its source and used it to purchase a wide array of securities, including many risky securities that did not comply with customers' investment portfolio guidelines. Risky securities were used in "repo" transactions or assigned to a house securities pool.[1] At the end of each day, Sentinel would assign securities to groups from its general pool of securities and would issue misleading customer statements listing the securities that were supposedly held in the customer's group account. Sentinel's "house" securities bought in part with customers' money did not appear on customer statements.

Sentinel also allocated a misleading sort of "interest income" to its customers on a daily basis. Under the terms of their agreements with Sentinel, customers were entitled to a *pro rata* share of the interest accrued by securities in their respective pools. However, Sentinel instead would calculate the interest earned by *all* securities, including those belonging to other Segments and the house pool. Sentinel would then guesstimate the yield its customers expected to receive on their group's securities portfolio, add a little extra so that the rate of return seemed highly competitive, and report the customer's *pro rata* share of that amount, minus fees, on the customer's statement.

---

[1] A "repo" transaction is like a short-term secured loan. One party sells a security to another for cash with a simultaneous agreement to repurchase the security at a later time for a slightly higher cash price. The difference in price is equivalent to interest. Sentinel engaged in repo transactions in both directions.

Sentinel funded its securities purchases using not only the customer cash in the segment accounts but also cash from repo transactions and money loaned to it by the Bank of New York (BONY), the bank where Sentinel housed the majority of its client accounts. BONY required Sentinel to move securities into a lienable account to serve as collateral for the loan. If Sentinel were to move Segment 1 or Segment 3 customer assets into a lienable account, meaning that BONY had a lien on those customer assets to secure its loans to Sentinel, then Sentinel would be violating the trust requirements of federal laws meant to protect Segment 1 and Segment 3 customers from precisely such a risk.

Originally, the BONY loan was meant to provide overnight liquidity. As Sentinel expanded its leveraged trading operations, though, it used the BONY loan to cover the fees those trades required. Sentinel's BONY loan ballooned, growing from around $55 million in 2004 to an average of $369 million in the summer of 2007. As the loan grew, Sentinel began using securities that were assigned to customers as collateral for its own borrowing, moving them out of their segregated accounts and into the lienable account overnight. This meant that securities that were supposed to be held in trust for customers were instead being used for Sentinel's financial gain and were subject to attachment by BONY, a flagrant violation of both SEC and CFTC requirements.

Sentinel's illegal behavior left customer accounts in both Segment 1 and Segment 3 chronically underfunded, but customers were none the wiser. The securities that were serving as collateral for the BONY loan continued to appear on customer statements as if they were being held in segregated

accounts for their benefit even though Sentinel was routinely removing them from those accounts.

The music came to a crashing halt in the summer of 2007 as the subprime mortgage industry collapsed and credit markets tightened. Many of Sentinel's repo counter-parties began returning the high-risk, illiquid physical securities that Sentinel had loaned to them. They demanded cash in exchange. Sentinel did not have the cash on hand to pay them and was unable to sell the returned securities. It was also unable to sell its own similar house securities to raise cash. So Sentinel borrowed even more from BONY, putting at risk even more of the supposedly segregated customer assets.

BONY soon notified Sentinel that it would no longer accept physical securities as collateral. It began pressuring Sentinel to pay down its gigantic loan balance. In response, Sentinel moved $166 million worth of still-valuable corporate securities out of Segment 1, where they were held in trust, to a lienable account as collateral for the BONY loan, again violating federal segregation requirements and exposing Segment 1 customer assets to the risk of attachment by BONY. Sentinel also sold a large number of Segment 1 and Segment 3 securities to pay down the loan, again treating customer securities as if they belonged to Sentinel itself and using them for its own financial gain. On August 16, 2007, BONY asked Sentinel to repay its loan in full immediately. The following day, BONY told Sentinel that due to the failure to repay the loan, it would begin

liquidating the loan's collateral in a few days. Sentinel filed for bankruptcy protection that same day.[2]

Sentinel took several actions as it approached bankruptcy that dramatically improved the situation of the Segment 1 customers and worsened that of the Segment 3 customers. On July 30 and 31, 2007, Sentinel returned $264 million worth of securities to Segment 1 from a lienable account where they had been placed in violation of segregation requirements. Sentinel then moved $290 million worth of securities from the Segment 3 trust into the same lienable account. This virtually emptied the Segment 3 trust and once again violated federal securities laws. Then, even after informing its customers on August 13 that it would no longer honor requests for redemption, Sentinel nevertheless paid out full and partial redemptions to some Segment 1 customers. Sentinel also distributed cash to two Segment 1 groups that constituted the full value of those accounts. Finally, on Friday, August 17, mere hours before filing for bankruptcy, Sentinel distributed $22.5 million in cash to two additional Segment 1 groups, one of which included FCStone. FCStone received $1.1 million in that distribution, which is the pre-petition transfer at issue in these appeals.

After filing for bankruptcy protection, Sentinel again acted to protect the Segment 1 customers at the expense of its other

---

[2] Federal criminal charges have been filed against Sentinel's former president and CEO Eric A. Bloom and former senior vice president Charles K. Mosley in the Northern District of Illinois. See case No. 1:12-CR-00409. So far, Mosley has pled guilty to two counts of investment advisor fraud. Bloom's jury trial began on February 25, 2014 and had not ended as of March 17, 2014.

customers and creditors. On Thursday, August 16, Sentinel had sold a portfolio of Segment 1 securities to a company called Citadel and deposited the proceeds of more than $300 million in a Segment 1 cash account. Sentinel filed for bankruptcy the next day, on Friday, August 17.

On Monday, August 20, while still controlled by insiders, Sentinel filed an emergency motion with the bankruptcy court seeking an order allowing BONY to distribute the Citadel sale proceeds to the Segment 1 customers. The SEC, CFTC, and at least one Segment 3 customer appeared at an emergency bankruptcy court hearing. They expressed concerns that Sentinel might have been commingling funds and securities (which was in fact the case), and that there was reason to suspect that Segment 3 securities had been sold to Citadel. After hearing from all who were present (including Sentinel, Citadel, BONY, and some Segment 1 customers), the bankruptcy court issued an order on August 20, 2007 allowing BONY to release the funds. BONY did so on August 21. FCStone received nearly $14.5 million in that distribution, which is the post-petition transfer at issue here.[3]

The bankruptcy court later appointed Frederick Grede as trustee of the Sentinel bankruptcy estate. The trustee filed

---

[3] The trustee asserts that the money that was released by BONY was not from the Citadel sale, but rather came from a Segment 3 cash account. If this is correct, then Sentinel's solicitousness for the Segment 1 customers over the Segment 3 customers after its bankruptcy filing was even more dramatic. Because we hold that the bankruptcy judge authorized the transfer, however, it does not matter who is correct, so we adhere to the district court's findings of fact.

adversary proceedings in the bankruptcy court seeking to avoid Sentinel's pre- and post-petition transfers to FCStone and others. The district court withdrew the reference to the bankruptcy court because it found the proceedings raised significant and unresolved issues of non-bankruptcy law. *Grede v. Fortis Clearing Americas LLC*, No. 09-C-138, 2009 WL 3518159, at *3–4 (N.D. Ill. Oct. 28, 2009). The current case against FCStone was selected as a test case to resolve common issues among the trustee's adversary proceedings against other FCMs who received pre-petition and post-petition transfers. (We do not discuss the other FCMs further.) The trustee sought to avoid Sentinel's pre-petition transfer to FCStone under 11 U.S.C. § 547, and Sentinel's post-petition transfer to FCStone under 11 U.S.C. § 549. The trustee also alleged unjust enrichment.

The district court held that the trustee could avoid the pre- and post-petition transfers. *Grede*, 485 B.R. 854. The court examined the post-petition transfer first, focusing on whether the transfer involved property of the estate and was authorized by the bankruptcy court, see 11 U.S.C. § 549, and whether FCStone was an initial transferee or beneficiary of the transfer as required by 11 U.S.C. § 550(a)(1) to avoid a transfer. In the court's view, the post-petition transfer involved property of the estate. The court found that both the Segment 1 and Segment 3 customers were protected by statutory trusts and that the two trusts stood on equal footing. Because there were thus two equal trusts competing for an insufficient pool of assets, the court applied *Cunningham v. Brown*, 265 U.S. 1 (1924), and concluded that the Segment 1 customers would need to trace their assets to specific bankruptcy estate assets to be able to

claim rights to trust property. If just one trust had been involved, the district court would have applied tracing conventions to preserve the trust, but the court found tracing conventions to be inappropriate in this case because of the existence of two competing trusts. See *Grede*, 485 B.R. at 874–78 (discussing tracing conventions). The court then found that FCStone was unable to trace its assets, which meant that its trust failed and the transferred assets were property of the estate, making their transfer subject to avoidance.

The district court also concluded that the bankruptcy court did not authorize the post-petition transfer of the Citadel sale proceeds within the meaning of 11 U.S.C. § 549(a) and that FCStone was an "initial transferee" and beneficiary under 11 U.S.C. § 550(a)(1). The district court therefore concluded that the trustee could avoid the post-petition transfer to FCStone. 485 B.R. at 884.

Turning to the pre-petition transfer, the court held that the transfer was not a "settlement payment" and was not made "in connection with a securities contract" within the meaning of 11 U.S.C. § 546(e)'s safe harbor provision for such payments that insulates them from most preference claims. The court concluded that the trustee could therefore avoid the pre-petition transfer as well. 485 B.R. at 887. Finally, the court held that the trustee's unjust enrichment claim was preempted by bankruptcy law. *Id.* at 888.

FCStone appeals the rulings avoiding both the pre- and post-petition transfers. It contends that the transfers did not involve property of the estate, that the pre-petition transfer fell within § 546(e)'s safe harbor, that FCStone was neither an

initial transferee nor a beneficiary of either transfer, and that the post-petition transfer was authorized by the bankruptcy court. The trustee cross-appeals seeking prejudgment interest. He also argues for reinstatement of the unjust enrichment claim in the event that we reverse on the avoidance claims. We review the district court's findings of fact for clear error, but review both legal questions and mixed questions of law and fact *de novo*. *Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir. 2004).

II. *Analysis*

These appeals present many questions, but we find that just two are decisive. First, we conclude that the trustee cannot avoid the pre-petition transfer because 11 U.S.C. § 546(e)'s safe harbor provision applies. Second, we conclude that the bankruptcy court authorized the post-petition transfer, meaning that 11 U.S.C. § 549 bars the avoidance or clawback of that transfer.

A. *The Pre-Petition Transfer*

In general, a bankruptcy trustee can avoid a transfer that (1) was made to or for the benefit of a creditor, (2) was for or on account of an antecedent debt, (3) was made while the debtor was insolvent, (4) was made on or within 90 days before the date of the filing of the petition, and (5) allowed the creditor to receive more than it otherwise would have through the bankruptcy. 11 U.S.C. § 547(b); *Warsco v. Preferred Technical Group*, 258 F.3d 557, 564 (7th Cir. 2001). This general provision is designed to prevent a debtor approaching bankruptcy from choosing on its own to favor some creditors at the expense of others in ways that are not consistent with the priorities and preferences of bankruptcy law. *Id.* at 564.

The trustee's power to avoid transfers made on or within 90 days before a bankruptcy filing means that many financial transactions are not really final until those 90 days have passed. In securities and financial markets, however, such uncertainty can have especially high costs. In 11 U.S.C. § 546(e), Congress enacted a special provision exempting many payments in securities transactions from this power:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or *settlement payment*, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is *a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract*, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

(Emphasis added.)

The purpose of this safe harbor was "to ensure that honest investors will not be liable if it turns out that a leveraged buyout (LBO) or other standard business transaction technically rendered a firm insolvent." *Peterson v. Somers Dublin Ltd.*,

729 F.3d 741, 748 (7th Cir. 2013); see also Peter S. Kim, Navigating the Safe Harbors: Two Bright Line Rules to Assist Courts in Applying the Stockbroker Defense and the Good Faith Defense, 2008 Colum. Bus. L. Rev. 657, 663–64. Otherwise, one firm's bankruptcy could cause a domino effect as its clients could similarly default on their obligations, which in turn would trigger further bankruptcies, and so on. By preventing one large bankruptcy from rippling through the securities industry in this way, the § 546(e) safe harbor protects the market from systemic risk and allows parties in the securities industry to enter into transactions with greater confidence.

We agree with FCStone that Sentinel's pre-petition transfer fell within § 546(e)'s safe harbor. The district court's findings of fact show that the transfer to FCStone was a "settlement payment" and was made "in connection with a securities contract" within the meaning of § 546(e).

Section 546(e) states that the trustee may not avoid a pre-petition transfer made to a commodity broker that is either a "settlement payment, as defined in section 101 or 741 of this title," or "in connection with a securities contract, as defined in section 741(7)," except under 11 U.S.C. § 548(a)(1)(A). The parties agree that FCStone is a commodity broker and that the transfer occurred before the commencement of the bankruptcy case. The only disputed issues are whether the transfer was a "settlement payment" or was made "in connection with a securities contract" as those terms are defined in the statute. If the answer to either question is yes, the safe harbor applies and the pre-petition transfer may not be avoided. The answer to both questions is yes.

The statute defines a settlement payment in a broad if rather circular manner as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8). We have held that swapping shares of a security for money (as happens in a customer redemption) is a settlement payment within the meaning of § 546(e). See *Peterson*, 729 F.3d at 749. Here, Sentinel's customers did not have rights to specific securities, but they were entitled to *pro rata* shares of the value of the securities in their groups' portfolios. That meant that Sentinel could finance customer redemptions by selling securities from their group's portfolio or by paying them with cash it had on hand. Regardless of how Sentinel chose to fund customer redemptions, the redemptions were meant to settle, at least partially, the customers' securities accounts with Sentinel. The pre-petition transfer to FCStone thus qualified as a "settlement payment" under § 546(e).

The pre-petition transfer was also made "in connection with a securities contract," which is an independent basis for applying the safe harbor of § 546(e). Section 741(7) defines "securities contract" very broadly, including but not limited to "a contract for the purchase, sale, or loan of a security." Although Sentinel's investors like FCStone did not have rights to specific securities under their investment agreements, the agreements did authorize (and expect) Sentinel to purchase and sell securities as it saw fit for the benefit of its customers as long as it complied with the portfolio's investment guidelines. The fact that the Segment 1 customers were entitled to cash rather than to the securities themselves does not change the

fact that these customers' investment agreements were contracts for the purchase and sale of securities. Additionally, although Sentinel could and did partially redeem FCStone's account without selling securities from the Segment 1 portfolio, the redemption still served in part to satisfy Sentinel's obligations to FCStone under the investment agreement. So the pre-petition transfer to FCStone in partial redemption of its account was made "in connection with" the investment agreement, and therefore "in connection with a securities contract" within the meaning of § 546(e).

The district court came to different conclusions based not on the text of § 546(e) but on policy grounds, concluding that Congress could not have intended the safe harbor provisions to apply to the circumstances of this case. *Grede*, 485 B.R. at 885–86. The court distinguished between an insolvent debtor selling a security to a buyer just before going bankrupt and an insolvent debtor distributing the proceeds of the sale of a customer's security. In the district court's view, shielding the transaction between debtor and buyer serves § 546(e)'s purpose of preventing destructive ripple effects in the case of a bankruptcy, whereas shielding the debtor's distribution of sale proceeds to customers would destabilize the financial system because it would be impossible to predict who would receive money in the event of a bankruptcy. Because the court did not think Congress could have intended this result, at least under the circumstances shown here, it held that § 546(e) did not protect Sentinel's pre-petition transfer to FCStone from avoidance.

We understand the district court's powerful and equitable purpose, but its reasoning runs directly contrary to the broad

language of § 546(e). The text of § 546(e) does not include an exception for preferential transfers, although it does make an exception for actual fraud. See 11 U.S.C. § 546(e), citing 11 U.S.C. § 548(a)(1)(A) (trustee's power to avoid fraudulent transfers). We have explained that "[t]he presence of an exception for actual fraud makes sense only if § 546(e) applies as far as its language goes." *Peterson*, 729 F.3d at 749. Its broad language reaches this case, and there has been no claim of actual fraud in the challenged pre-petition transfer.

As important as the statutory text is, we hope we are not understood as applying a wooden textualism to the issue. We also do not see any persuasive reason to depart from the deliberately broad text of § 546(e). We are not persuaded that Congress could not have intended to protect even pre-petition transfers like the one in this case. Congress enacted § 546(e) to prevent a large bankruptcy from triggering a wave of bankruptcies among securities businesses. Section 546(e) applies only to the securities sector of the economy, where large amounts of money must change hands very quickly to settle transactions. Those dealing in securities have an interest in knowing that a deal, once completed, is indeed final so that they need not routinely hold reserves to cover the possibility of unwinding the deal if a counter-party files for bankruptcy in the next 90 days. Also, even a short term lack of liquidity can prove fatal to a commodity broker or other securities business.

By enacting § 546(e), Congress chose finality over equity for most pre-petition transfers in the securities industry—*i.e.*, those not involving actual fraud. In other words, § 546(e) reflects a policy judgment by Congress that allowing some otherwise avoidable pre-petition transfers in the securities industry to

stand would probably be a lesser evil than the uncertainty and potential lack of liquidity that would be caused by putting every recipient of settlement payments in the past 90 days at risk of having its transactions unwound in bankruptcy court. The Supreme Court recently reminded us that Congress has balanced many of the difficult choices that must be made in bankruptcy cases, and that courts may not decline to follow those policy choices on equitable grounds, however powerful they may be in a particular case. *Law v. Siegel*, 571 U.S. —, —, 134 S. Ct. —, —, 2014 WL 813702, at *8 (2014). Given the broad statutory language and Congress' evident and understandable policy choice, we hold that Sentinel's pre-petition transfer to FCStone fell within § 546(e)'s safe harbor and that the trustee cannot avoid the pre-petition transfer under 11 U.S.C. § 547.[4]

B. *The Post-Petition Transfer*

A bankruptcy trustee can avoid a transfer of property of the estate that occurs after the commencement of the case if it was not authorized under the bankruptcy code or by the bankruptcy court. 11 U.S.C. § 549. FCStone contends that the post-petition transfer of $300 million from one of Sentinel's BONY

---

[4] FCStone argues that the pre-petition claim was not actually part of the trial in the district court so that the court's decision deciding that claim violated its due process rights. The record shows that the pre-petition transfer claim and § 546(e) issues were fully briefed at summary judgment, and that the district court declined to rule on the summary judgment motion until after trial. We think the parties had ample reason to understand that the district court considered the claim ripe for ruling, so we reject FCStone's due process argument.

accounts to Segment 1 customers, including FCStone, was authorized and did not involve property of the estate.[5]

As discussed above, on the first business day after the bankruptcy petition was filed, Sentinel asked the bankruptcy court for an emergency order allowing BONY to disburse funds to Segment 1 customers, including FCStone. Sentinel claimed that the funds belonged to the Segment 1 customers and were not property of the estate because they were the proceeds of the sale of Segment 1 securities to Citadel. The SEC cautioned, and the CFTC conceded, that there was evidence that Sentinel had commingled Segment 1 and Segment 3 funds and that Sentinel had sold Segment 3 securities to Citadel. The SEC opposed the order on that basis. Despite these concerns, the bankruptcy judge approved the transfer, which was carried out very quickly.

A trustee may not avoid a transfer of property of the estate under 11 U.S.C. § 549 if the transfer was authorized by the

---

[5]   FCStone also argues that it was neither an initial transferee nor a beneficiary under 11 U.S.C. § 550(a)(1), and that the trustee therefore cannot avoid the transfer. Because we hold that 11 U.S.C. § 549 bars avoidance of the transfer, we do not resolve FCStone's arguments under § 550(a)(1). However, we believe it is evident that FCStone was either an initial transferee or a beneficiary, as FCStone's own inconsistent arguments show. To argue that it was not an initial transferee, FCStone claims that it was a mere conduit for the Citadel money, which belonged to its customers and not to FCStone. But then, to argue that it was not a beneficiary of the transfer, FCStone asserts that it was under no obligation to pay those customers in the event of a shortfall. FCStone cannot have it both ways. We need not decide which position is correct, but FCStone was necessarily either an initial transferee or a beneficiary under § 550(a)(1).

bankruptcy court. Over a year after the order had been approved and acted upon, the trustee moved the court to "clarify" the order and to declare that it had not actually authorized the transfer under § 549 to clear the way for the avoidance action. By that time, the consequences of the post-petition transfer were better understood. The trustee's motion to clarify asserted that the disbursed property turned out to have been property of the estate after all, and he asked the court to clarify that the order did not affect the trustee's right to avoid the post-petition transfer. In ruling on the motion to clarify, the bankruptcy court knew that its emergency order was a barrier to a more equitable distribution of Sentinel's property. After full briefing and oral argument, the bankruptcy court held that its order had not authorized the transfer within the meaning of § 549 and thus did not prevent avoidance of the post-petition transfer.

The trustee argues and the district court held that although the bankruptcy court allowed BONY to disburse the funds to Sentinel's customers, including FCStone, the bankruptcy court did not authorize the transfer within the meaning of 11 U.S.C. § 549. See *Grede*, 485 B.R. at 881. In the trustee's view, to authorize the transfer under § 549, the bankruptcy court needed to decide whether the property belonged to the estate, which the court did not do. The trustee also argues that the order explicitly reserved the debtor's right to avoid the transfers.

We conclude that the post-petition transfer was clearly authorized by the bankruptcy court. That court's later "clarification" of its order ran contrary to the plain language of its order. We also are not persuaded that the bankruptcy court

order actually authorizing the transfer somehow managed not to authorize the transfer within the meaning of 11 U.S.C. § 549. It was an abuse of discretion for the bankruptcy court to have reached that conclusion as part of its clarification.

For starters, we do not think that the bankruptcy court must first decide that the property at issue belongs to the estate in order to authorize the transfer within the meaning of § 549. The section states that "the trustee may avoid a transfer of property of the estate … that is not authorized under this title or by the court." This merely requires that, before an earlier transfer can be avoided, the court must find that it was "a transfer of property of the estate." It does not require that a court authorizing a transfer decide at that time that the transfer involves property of the estate.

For instance, if a bankruptcy trustee wishes to disburse funds that do *not* belong to the estate, nothing prevents it from asking the bankruptcy court, out of an abundance of caution, to issue a comfort order authorizing the disbursement of admittedly non-estate funds. It cannot be the case that requesting the court's authorization would somehow subject that transfer to additional scrutiny (and potential clawback) that would not apply if the trustee had simply disbursed the funds to their owners, as he would have been perfectly entitled to do. See *In re Kmart Corp.*, 2006 WL 952042, *7 (Bankr. N.D. Ill. April 11, 2006) (§ 549 protects all transfers "under court orders, whether erroneously entered or not, that are not subsequently reversed;" as long as the authorization order remains in effect, § 549 protects distributees from collateral attack).

Whether the property belonged to the estate or not, in the absence of reversal, the authorization order ended any discussion about its original ownership, and the disputed property cannot later be clawed back by the trustee. See *Vogel v. Russell Transfer, Inc.*, 852 F.3d 797, 800–01 (4th Cir. 1988) (rejecting trustee's argument that bankruptcy court authorization of a post-petition transfer was meaningless because transfer did not involve property of the estate; if no estate property was involved, then § 549 does not apply at all, meaning post-petition clawback is unavailable). Whether the transfer was authorized for purposes of § 549 did not depend on whether the bankruptcy court made a concurrent finding about whether the property was property of the estate.

The text of the order did not reserve the trustee's right to avoid the transfer. Such a reservation would be illogical if the order authorized the transfer under § 549, because § 549 allows the trustee to avoid transfers only if they have not been authorized by the court. Reserving the trustee's right to avoid the (authorized) transfer would thus suggest that, however illogical it may seem, the order authorized the transfer without authorizing it under the bankruptcy code. Since the order refers to the distribution as being "authorized" by the order, that argument is difficult to make. If the trustee were correct that the order reserved his right to avoid the transfer, it would go a long way towards establishing this seemingly illogical proposition.

Unfortunately for the trustee and the interests he represents, however, the order did not preserve such a right to avoid the transfer. In negotiations about the order, the parties agreed to reserve a five percent "holdback" to cover any unanticipated

claims that might arise. The order then stated that it was "without prejudice to all rights, defenses, claim [sic] and/or causes of action, if any, of the Debtor or any such third parties (including Citadel) against any Distributee, with respect to the Holdback and/or with respect to any claim for priority under Section 761–767, or other applicable law." (Sections 761–767 of the bankruptcy code deal with the liquidation of a commodity broker; no argument has been made that the avoidance claim is based on any of those sections.) The trustee contends that the comma before "or other applicable law" means that the sentence protected the debtor's rights against distributees (1) with respect to the five percent holdback contemplated in the order, (2) with respect to claims for priority under 11 U.S.C. §§ 761–767, or (3) with respect to other applicable law. Under that reading, the order reserved all of the debtor's legal rights against distributees, allowing the debtor to avoid the post-petition transfer.

The trustee's reading is not correct. The placement of "with respect to" twice in the sentence divided the sentence into two parts: (1) the holdback, and (2) claims for priority under sections 761–767 or other applicable law. The use of "and/or" between the holdback claims and the priority claims, but not between priority claims under sections 761–767 and "other applicable law," also indicates that "other applicable law" modifies only the types of priority claims that can be brought. It follows that the sentence should be read to protect the debtor's rights against distributees (1) with respect to the five percent holdback contemplated in the order, and (2) with respect to claims for priority under 11 U.S.C. §§ 761–767 or other applicable law. The reservation of a five percent

holdback signaled quite clearly that the rest of the distribution was not subject to avoidance. If it had been, then the holdback would not have been needed. The text of the order did not preserve the trustee's ability to avoid the funds under 11 U.S.C. § 549.

The trustee contends that we should interpret the order in light of the transcript of the hearing leading to the order authorizing the transfer. In general, there should be no need to go beyond the text of a court order unless its meaning is unclear. *Mendez v. Republic Bank*, 725 F.3d 651, 663 (7th Cir. 2013); cf. *Oneida Tribe of Indians of Wisconsin v. Wisconsin*, 951 F.2d 757, 760–61 (7th Cir. 1991) (we look beyond the text of a statute only if it is inconclusive or clearly contravenes express congressional intent). Relying on the hearing transcript rather than the text of the resulting court order to decide what the order meant can raise serious problems. See *Mendez*, 725 F.3d at 663. Parties and non-parties alike should be able to rely on the text of a court order where the text is clear, rather than having to dig through the docket and record to determine the order's true meaning. See *id.* Especially where, as here, the issues were urgent and the stakes were high (including, in this case, the potential collapse of a dozen FCMs and wide ripple effects), parties and non-parties should be able to act in reliance on the order itself, without waiting for a transcript or inquiring further.

In this case, FCStone and other parties needed BONY to release the money within hours of the order being issued so that they could in turn pay their obligations to their own customers. Requiring FCStone to pore through the court record before deciding whether the transfer was authorized and

whether it could transfer the money on to its own customers without risk of having to return the money to Sentinel would have effectively nullified the emergency order. The amounts were large enough that if FCStone could not transfer the money to meet its obligations to its customers, it would have been insolvent itself. So, finding the text of the order unambiguous, we do not base our decision on the transcript of the hearing where the order was approved.[6]

The trustee also argues that we should defer to the bankruptcy court's later interpretation of its order. The district court deferred to the bankruptcy court's later interpretation of the order, citing *In re Resource Tech. Co.*, 624 F.3d 376, 386 (7th Cir. 2010), which in turn cited *In re Airadigm Communications, Inc.*, 547 F.3d 763, 768 (7th Cir. 2008), for the broad proposition that we will leave the interpretation of a bankruptcy court's order to that court's discretion. At the same time, we have raised concerns about such deference to an issuing court's interpretation, especially when the issue affects reliance interests and the interests of non-parties, rather than just issues such as case management. See *In re Trans Union Corp. Privacy Litigation*, 741 F.3d 811, 816 (7th Cir. 2014). "Litigants as well as third parties must be able to rely on the clear meaning of court orders setting out their substantive rights and obligations, and

---

[6] We have examined the hearing transcript at the parties' request. It would not change our interpretation of the bankruptcy court's order. As discussed above, the court was acting under extreme time pressure and may not have fully appreciated the legal consequences of authorizing the transfer. Nevertheless, the transcript shows quite clearly that the bankruptcy court authorized the transfer, notwithstanding its later regrets. Consideration of the transcript would not change our interpretation of the order's plain text.

appellate courts should interpret those orders in the same manner." *Id.* These concerns are particularly acute in a situation like the bankruptcy court's order authorizing payments to non-parties.

Too much deference to a bankruptcy court's much-later interpretation would undermine the ability of parties and non-parties to rely on a court order and creates the risk that interpretation of an order becomes a means to rewrite it after unintended consequences have given rise to regrets. When the order here was issued, the parties acted in reliance on its text. That means that the FCMs like FCStone passed the BONY money along to their customers in satisfaction of their trades and accounts, and both the FCMs and their customers were entitled to assume the money was unencumbered. That allowed the FCMs to settle their transactions and to stay afloat rather than filing for bankruptcy protection themselves back in 2007.

If we were to conclude now that the authorized transfer was not authorized after all, FCStone would face the resulting liquidity crunch now. The losses would fall not on its clients and creditors of 2007 but on its later clients and creditors, meaning that losses would fall quite differently than they would have in 2007. In other words, the bankruptcy court's later interpretation of its order would change the allocation of the loss stemming from Sentinel's bankruptcy, shifting it away from one group of FCStone customers and onto another. FCStone, the other FCMs, their customers, and all other affected parties have strong reliance interests in not allowing

the bankruptcy court or the trustee to rewrite history in this way.[7]

The situation might be different if the bankruptcy court had clarified its order before parties and others had relied on the order's plain meaning to their detriment. However, deferring to the bankruptcy court's clarification made so long after the fact, when the money has already been disbursed to the FCMs and distributed to their customers, would upset the strong and reasonable reliance interests of those parties.

In this case, the text of the original order was sufficiently clear to find that the bankruptcy court's clarification, to the effect that the authorized transfer was not actually authorized for purposes of § 549, was an abuse of discretion. We would reach the same result if the appropriate standard of review is *de novo*.

We conclude, then, that the bankruptcy court authorized the post-petition transfer within the meaning of 11 U.S.C. § 549. The trustee therefore cannot avoid the transfer. We doubt whether a bankruptcy court can *ever* authorize a transfer without authorizing it under § 549, but that's a larger puzzle we leave for another day. If such a thing is possible, it did not occur in this case. We thus do not decide whether the other elements of § 549 are satisfied, including whether the funds at

---

[7] The reliance interests here are not purely speculative. Several parties at the hearing on the trustee's motion to clarify said that they had relied on the order's plain meaning, which in their view did not require clarification. They also stated that at the time the order was issued on August 20, 2007, they understood the court to have decided that the funds at issue were not property of the estate and thus not subject to avoidance by the trustee.

issue were, in fact, property of the estate. (The property-of-the-estate question is also academic in this case because Sentinel's approved bankruptcy plan treats all customers as part of a single class of unsecured creditors, and the time to appeal it has passed. That means that FCStone and the other Segment 1 and Segment 3 customers will be treated as unsecured creditors whether they can establish their trusts or not.) Because the case before us is a test case, though, we will say a few words about that question in an effort to provide guidance to the district court in future related cases.

Both the Segment 1 and Segment 3 funds were subject to statutory trusts. Segment 1 was protected by the Commodity Exchange Act and related CFTC regulations, while Segment 3 was protected by the Investment Advisors Act and related SEC regulations. We agree with the district court that there is no legal basis for placing one trust ahead of the other, despite FCStone and the CFTC's attempts to argue otherwise. See *Grede*, 485 B.R. at 871–72. This bankruptcy therefore presented two equal pools of statutory trust claimants battling over an insufficient pool of commingled funds. The district court found the situation analogous to that in *Cunningham v. Brown*, 265 U.S. 1 (1924), where common law trusts were battling over the insufficient commingled assets of Charles Ponzi, who gave his name to so many later Ponzi schemes. FCStone, however, argues that the proper analogy is to *Begier v. I.R.S.*, 496 U.S. 53 (1990), where the IRS benefitted from a statutory floating trust for tax payments it was owed by the debtor. (A floating trust is a trust in an abstract dollar amount rather than a trust in specific property. *Begier*, 496 U.S. at 62.)

Between these two options, we think the district court had the better answer and that *Cunningham* and its progeny provide useful insight for resolving the competing trust claims in this case. (We do not think that *Begier* applies here because it involved a floating trust.) That would suggest that the *Cunningham* requirement that claimants trace their assets to establish their trusts (without the benefit of tracing conventions) would apply here as well. See *Cunningham*, 265 U.S. at 11. FCStone rightly notes, though, that *Cunningham* did not involve statutory trusts, and we too find the difference significant. Where Congress has acted to establish a trust for certain customers to strengthen their confidence in capital markets, the trust may be more robust than one imposed by a court's equitable powers. The congressional protection indicates a national interest in protecting those customers. In short, we agree with the district court's discussion of this problem. See *Grede*, 485 B.R. at 874–78.

A new rule may be in order for competing statutory trust claimants that splits the difference between the harsh consequences of failing to trace under *Cunningham*, and the lax tracing requirements under *Begier*. One such rule might be to require trust claimants to trace without the benefit of tracing conventions, but to place trust claimants who fail to trace in a class ahead of at least unsecured creditors, giving them priority in bankruptcy proceedings. Again, we are not required to resolve the issue today, both because we reverse on other grounds and because the Sentinel bankruptcy plan (which treats all creditors as a single class of unsecured creditors) has been approved and the time to appeal it has run out.

C.  *The Trustee's Cross-Appeal*

The trustee cross-appealed for reinstatement of his unjust enrichment claim if we reversed the district court, and for pre-judgment interest. We agree with the district court that the trustee's unjust enrichment claim is preempted by federal bankruptcy law. To allow an unjust enrichment claim in this context would allow the trustee or a creditor to make an end run around the bankruptcy code's allocation of assets and losses, frustrating the administration of the bankruptcy estate under federal bankruptcy law. See *Contemporary Industries Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009); *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 426 (6th Cir. 2000). We therefore will not reinstate the trustee's unjust enrichment claim. We also do not award the trustee pre-judgment interest because he is not the prevailing party. See, *e.g.*, *In re Oil Spill by the Amoco Cadiz Off Coast of France on Mar. 16, 1978*, 954 F.2d 1279, 1331 (7th Cir. 1992).

The judgment of the district court is REVERSED and the case is remanded to the district court for further proceedings consistent with this opinion.