In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3372

COMMODITY FUTURES TRADING COMMISSION,

*Plaintiff-Appellee,*

*v.*

WORTH BULLION GROUP, INC.,
MINTCO LLC, AND DIAMOND STATE DEPOSITORY LLC,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 12 C 2431—**John A. Nordberg,** *Judge.*

ARGUED JANUARY 22, 2013—DECIDED MAY 29, 2013

Before RIPPLE and ROVNER, *Circuit Judges*, and BARKER,
*District Judge.**

BARKER, *District Judge.* This appeal arises from an
action filed by the United States Commodity Futures

---

* The Honorable Sarah Evans Barker, United States District
Court for the Southern District of Indiana, sitting by designation.

Trading Commission ("CFTC") to enforce several administrative subpoenas served on Worth Bullion Group, Inc. ("Worth"), Mintco LLC ("Mintco"), and Diamond State Depository LLC ("DSD") in connection with the CFTC's investigation into whether appellants are in violation of various sections of the Commodity Exchange Act. 7 U.S.C. §§ 1 *et seq.* Worth, Mintco and DSD all conduct business in the precious metals market. Worth is a precious metal wholesaler; Mintco is a precious metals dealer and retailer; and DSD is a depository for storing precious metals. The subpoenas seek documents relating to purchases or sales of precious metals in which appellants were involved.

Appellants handed over the documents requested by the CFTC, but redacted the names and contact information of the individual customers, retailers, and intermediaries, asserting that they (the appellants) are covered by the Right to Financial Privacy Act ("RFPA"), which requires that customers of a "financial institution" be given notice and the opportunity to object before any disclosures are made.[1] *See* 12 U.S.C. §§ 3401, 3402(2), 3405. The district court rejected this argument, finding that the RFPA does not apply to appellants, and ordered

---

[1] Before the district court, appellants alternatively argued that the materials that they produced established that the CFTC does not have jurisdiction over the transactions at issue because the documents show that delivery of precious metals in each instance occurred within 28 days of the sale, which places them outside the scope of 7 U.S.C. § 2(c)(2)(D). That issue has not been renewed on appeal, however.

Worth, Mintco, and DSD to comply in full with the sub-poenas. The district court's order is currently stayed pending appeal. On appeal, we consider whether appellants are covered "financial institutions" under the RFPA. For the reasons explained below, we hold that they are not and thus affirm the district court's holding.

## I.  BACKGROUND

Worth's business is the purchase of precious metals on world markets which it sells to retailers, such as Mintco, who sell the metal(s) to retail customers, who are generally individuals. Worth uses a form agreement with each of its retailers and requires its retailers to use similar agreements with each of their customers in connection with sales made by them. In a typical transaction, after a retailer makes a sale, it submits the order to Worth so that the metal can be transferred from Worth to the customer.

When Worth purchases precious metals, it arranges for the metals to be delivered to DSD, an independent, secure depository. Upon receipt, DSD initially holds the metals in a master account that it maintains for Worth. Worth claims that when one of its retailers makes a sale, delivery to that customer is effected by Worth's instructions to DSD to transfer the amount of metal(s) purchased by the customer from the master account into a subaccount that DSD creates for that customer. DSD then prepares and transmits to the customer a non-negotiable warehouse receipt, which reflects the creation of the customer's subaccount. Under the terms of the agree-

ments Worth maintains with its retailers as well as the terms of the retailers' agreements with their customers, delivery occurs at the point when the metals are transferred to DSD with Worth's instructions to allocate the metals to the customer's account. According to Worth, it always makes delivery to its customers within 28 days.

Most of these precious metals sales are financed, meaning that the customer pays only a portion of the price and borrows the remainder. A significant portion of Worth's business includes financing customers' purchases of precious metals. When it makes a loan to a customer, Worth charges interest on the unpaid balance and takes a security interest in the metals as collateral. Worth also provides monthly account statements to its customers, which include the financing fees payable to Worth. Mintco reportedly arranges financing through Worth's financing program both for customers who purchase Worth's precious metals as well as for customers who purchase other metals. Financing generates approximately 80% of Worth's and 90% of Mintco's business and revenues.

The CFTC is an independent regulatory agency charged by law with the administration and enforcement of the Commodity Exchange Act, as amended, 7 U.S.C. §§ 1 *et seq*. ("CEA"). The CEA authorizes the CFTC to bring an enforcement action in federal court against any person who is violating or is about to violate any of the CEA's antifraud provisions. 7 U.S.C. § 13a-1. On November 15, 2011, the CFTC issued a formal order of investigation to determine whether any person, firm, or

entity has violated the CEA in connection with retail commodity transactions, including those in which appellants are engaged. In particular, the CFTC investigation is focused on: "whether any person has violated 7 U.S.C. § 6(a), which prohibits, *inter alia*, the sale of any commodity futures contract unless that sale is conducted on a contract market registered by the [CFTC]; 7 U.S.C. § 6b, which prohibits, *inter alia*, the use of deception in connection with the sale of any commodity futures contract; and 7 U.S.C. § 15, which prohibits any person from using deception in connection with the sale of any commodity in interstate commerce."[2]

Pursuant to its investigation, the CFTC issued subpoenas to Worth, Mintco, and DSD, seeking documents relating to the time period from July 16, 2011 to the present. The subpoena directed to Worth, issued on November 16, 2011, sought documents and information relating, *inter alia*, to the opening of accounts for customers; deliveries of metal from Worth to any customer; payments between Worth and any customer; sales or purchases of metals made by Worth for or on behalf of any customer; and Worth's precious metal financing. On December 7, 2011, the CFTC issued a subpoena to Mintco, seeking similar documents and information, including, *inter alia*, transaction history reports for all of Mintco's customers; documents related to the actual delivery of metal to Mintco's customers; documents related to the storage of metal by anyone on

---

[2] Appellee's Resp. at 7.

behalf of Mintco's customers; and documents related to loans, credit, or financing provided by Mintco to any customer. The CFTC issued two subpoenas to DSD, one on December 21, 2011, and the other on January 6, 2012. These subpoenas sought information concerning Worth, its retailers, and its customers, including, *inter alia*, documents regarding Worth's inventory of precious metals; documents related to the storage and physical delivery of precious metals for Worth, any affiliated dealers, and Worth's customers; and documents relating to sales or purchases of precious metals by Worth, its affiliated dealers, and its customers.

Worth, Mintco, and DSD each reportedly produced thousands of pages of responsive documents to the subpoenas, but failed to fully comply with the subpoenas by redacting the names and identifying information of their customers, independent retailers, and delivery intermediaries from the documents.[3] The identities of Worth's own suppliers and depositories were not redacted, however, nor were any dates, transaction data financial data, account numbers for customers, or retailers' identification numbers. Worth and Mintco based their decision to redact the identifying information on the relinquished materials on the grounds that, because financing consumers' purchases of metals was

---

[3] Appellants concede that the names and identifying information of the retailers and intermediary delivery companies must be produced and have not appealed that portion of the district court's ruling.

an essential part of their businesses, they were "financial institutions" under the RFPA and, as such, the CFTC was required to notify their customers before appellants were permitted to make any disclosures of personal information, and so informed the CFTC. DSD, although not claiming to be a covered financial institution, redacted information on its subpoenaed documents based on its contention that, as an agent of Worth, it is subject to the same restrictions under the RFPA.

The district court held that the RFPA does not apply to appellants because they do not fall within the statute's definition of "financial institution." Applying the doctrine of *noscitur a sociis*,[4] the district court determined that appellants' business was not sufficiently similar to the other entities listed in the RFPA's definition of "financial institution," and thus, ordered appellants to comply in full with the subpoenas. The district court subsequently stayed its ruling pending appeal, based on appellants' claim that compliance with the subpoenas would cause them irreparable harm.

---

[4] Under the doctrine of *noscitur a sociis*, "the meaning of questionable words or phrases in a statute may be ascertained by reference to the meaning of words or phrases associated with it." *United States v. Schuster*, 467 F.3d 614, 619-20 (7th Cir. 2006) (internal quotations and citation omitted).

## II. DISCUSSION

The RFPA expressly prohibits "financial institutions" from providing a government agency with access to any customer's financial records unless the customer is first given notice and the opportunity to object. 12 U.S.C. §§ 3402, 3405. The RFPA defines "financial institution" as "any office of a bank, savings bank, card issuer . . ., industrial loan company, trust company, savings association, building and loan, or homestead association (including cooperative banks), credit union, or consumer finance institution." 12 U.S.C. § 3401. Appellants contend that Worth and Mintco qualify as "consumer finance institutions" under this definition. The question of who qualifies as a "consumer finance institution" under the RFPA is a matter of first impression in this circuit.[5] As

---

[5] Following oral argument, our research disclosed that this issue has been recently addressed in the Southern District of Florida in *Federal Trade Comm'n v. Sterling Precious Metals, LLC*, No. 12-80597-CIV, 2013 WL 1442180 (S.D. Fla. Apr. 9, 2013), a case involving another of Worth's precious metal retailers and three of its members. There, defendants argued that they were consumer finance institutions under the RFPA by virtue of their facilitation of their customers' financing through Worth for the purchase of precious metals. In the alternative, defendants argued that, even if they themselves did not meet the definition, Worth qualifies as a consumer finance institution; they are Worth's agents and, as such, they are also covered under the RFPA. The district court held that the defendants were not consumer finance institutions under the

(continued...)

an issue of statutory construction, it is a legal question that we consider *de novo*. *Masters v. Hesston Corp.*, 291 F.3d 985, 989 (7th Cir. 2002) (citation omitted).

Our starting point in cases involving statutory construction is "the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Turley v. Gaetz*, 625 F.3d 1005, 1008 (7th Cir. 2010) (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)). In the absence of statutory definitions, "'we accord words and phrases their ordinary and natural meaning and avoid rendering them meaningless, redundant, or superfluous; we view words not in isolation but in the context of the terms that surround them . . . .'" *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1077 (7th Cir. 2013) (quoting *In re Merchants Grain, Inc.*, 93 F.3d 1347, 1353-54 (7th Cir. 1996)). Where we confront terms that are subject to competing definitions, "we usually define them in reference to the terms they appear with." *United States v. Taylor*, 640 F.3d 255, 263 (7th Cir. 2011). Statutory interpretation "is guided not

---

(...continued)

RFPA, rejecting many of the same arguments advanced here by appellants. The court did not reach the question of Worth's status under the RFPA, however, because it held that the defendants had failed to establish that they were, in fact, acting as agents of Worth, and thus, regardless of whether Worth was a financial institution, they were not covered entities.

just by a single sentence or sentence fragment, but by the language of the whole law, and its object and policy." *United States v. Balint*, 201 F.3d 928, 933 (7th Cir. 2000) (citations omitted).

Because the RFPA does not explicitly define "consumer finance institution," we begin with our analysis of the plain and ordinary meaning of the phrase. Acknowledging that we have on occasion regarded dictionaries to be "a helpful resource in ascertaining the common meaning of terms that a statute leaves undefined," *Shlahtichman v. 1-800 Contacts, Inc.*, 615 F.3d 794, 799 (7th Cir. 2010), appellants cite various dictionary definitions, primarily relying on Black's Law Dictionary, which defines "finance company" as "[a] nonbank company that deals in loans either by making them or by purchasing notes from another company that makes the loans directly to borrowers," and further defines "consumer finance company" as "[a] finance company that deals directly with consumers in extending credit." BLACK'S LAW DICTIONARY 706 (9th ed. 2009). Appellants also cite definitions of "consumer finance company" from internet sources, one of which defines the term as: "A nonbank lender. A consumer finance company does not receive deposits, but does make loans to customers for business or personal use. It derives its profits from the interest on these loans. It is also called simply a finance company." THE FREE DICTIONARY BY FARLEX, http://financial-dictionary.thefreedictionary.com/Consumer+Finance+Company (last visited on May 23, 2013). Appellants contend that both Worth and Mintco clearly

fall within these definitions because they are non-bank entities who deal directly with customers to provide and facilitate financing for business or personal use.

These dictionary definitions do not carry the day for appellants, however. As our court has previously cautioned, "[d]ictionary definitions are acontextual," *United States v. Costello*, 666 F.3d 1040, 1044 (7th Cir. 2012), and thus "must be used as sources of statutory meaning only with great caution." *Id.* at 1043. Here, when taken in context, the meaning of the term "consumer finance institution" is "narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008) (citations omitted); *see also Costello*, 666 F.3d at 1046 ("[A]djacent terms shed light on each other's meaning, . . . a light not to be found in a dictionary . . . .") (internal citation omitted). Under the principle of *noscitur a sociis*, "the fact that 'several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well.'" *Center for Individual Freedom v. Madigan*, 697 F.3d 464, 496 (7th Cir. 2012) (quoting *Beecham v. United States*, 511 U.S. 368, 371 (1994)).

It is clear that all of the referenced entities surrounding the phrase "consumer finance institution" in the RFPA's definition of "financial institution," including banks, card issuers, loan and trust companies, and credit unions, convey considerably more than a tangential or

secondary relationship to the field of financing. Rather, a primary reason each of these entities exists is to provide financing and cash loans to the general public, making these services a core function and purpose of such businesses. To avoid broadening the meaning of the term beyond what Congress intended when it enacted the RFPA, we assign a meaning of "consumer finance institution" with an eye toward "the company it keeps." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995). Applying that cannon of statutory construction here brings us to the conclusion that Congress did not intend "consumer finance institution" to include every retailer that extends financing to a percentage of its customers as part of its business, which would be the result if appellants' definition were adopted.[6]

The nature of appellants' businesses is readily distinguishable from that of the other entities listed in the RFPA's definition of "financial institution" and the similarities proffered by appellants are both chimerical and unavailing. Worth and Mintco provide financing

---

[6] Appellants criticize the CFTC for failing to put forth its own definition of "consumer finance institution." Although the CFTC has not proposed a specific definition, it referenced at oral argument a number of entities, including small loan companies, consumer discount companies, and household finance companies, as examples distinct from the other nine entities listed in the RFPA's definition of "financial institutions" but yet sufficiently similar to those entities to satisfy the doctrine of *noscitur a sociis* and thus qualify as "consumer finance institutions" under the RFPA.

primarily, if not solely, for the very narrow purpose of enabling or facilitating their customers' purchases of the goods they sell, to wit, precious metals. No evidence has been adduced that indicates that individuals who receive credit from Worth or Mintco also obtain cash loans or that they receive financing in amounts beyond the amount needed to bridge the gap between their down payments and the purchase prices of the precious metals which they are buying. In this way, the provision of financing is not a defining characteristic of appellants' business; rather, it is merely a means to an end, the real or primary goal of the transaction being a sale of precious metals. Clearly, Worth and Mintco are sellers, not financial institutions. This is, in fact, how they identify themselves—as a wholesaler and retailer of precious metals, respectively. Moreover, although appellants claim to be "consumer finance institutions," the loan contract which they use for their financing transactions explicitly provides that any financing that a borrower obtains through Worth's financing program is not to be used "for any personal, family, household or other consumer purposes."[7] Given these facts, it is clear that neither Worth nor Mintco qualifies as a "consumer finance institution," and thus they are not "financial institutions" under the RFPA. Further, the RFPA is inapplicable to DSD because appellants' only argument with regard to DSD is a "bootstrap" argument, namely, that, as Worth's agent, the RFPA applies to DSD to the extent it applies to Worth.

---

[7] A.R. at 226.

Any other argument likewise is not supported by the evidence. The evidence submitted by appellants in support of their contention that their business includes making loans to the public at large for purposes other than the purchase of their own precious metals[8] consists of two charts, both of which relate to the period from July 2011 to December 2012. According to the information reflected in the charts, during that time period, Worth made 4,441 loans totaling $246.7 million, and Mintco made 139 loans totaling $12.3 million. Of these loans, 572 of Worth's loans totaling $5.8 million, and nine of Mintco's loans totaling approximately $20,000, were loans "to the public at large for purposes other than the purchase of precious metals from any Appellant." Supp. Mem. at 2.

However, these bottom line numbers do not in and of themselves demonstrate that appellants provide loans to members of the general public who are not their customers for any purpose other than the purchase of

---

[8] Following oral argument, we requested that appellants supplement the record with documentation identifying loans made by appellants to the public at large. Appellants argue that the CFTC has waived any argument based on the relevance of such loans because it failed to raise this issue before the district court. However, the nature of appellants' financing activities is relevant to the application of the doctrine of *noscitur a sociis*, which was central to the district court's decision that appellants have challenged. Because the CFTC raised this issue in the context of defending the district court's opinion on appeal, there has been no waiver.

precious metals. For example, Worth is affiliated with a number of retailers, who, in turn, make sales to the public. Mintco is the only such retailer who is an appellant before us here. Thus, loans made to customers of Worth's other retailers for the purchase of precious metals would fall within the category of loans "for purposes other than the purchase of precious metals *from any Appellant*," but would clearly not be a loan to a member of the general public unrelated to the purchase of precious metals from Worth or its affiliated retailers. As the CFTC points out, without more information regarding the identity of the borrowers and the purpose of the loans, it is impossible to determine whether, for example, these numbers represent situations in which Worth has allowed existing customers who previously purchased precious metals from Worth or its retailers and have sufficient equity in their accounts to borrow against that equity. Again, such loans, even if they were for a purpose other than the purchase of precious metals, would not necessarily demonstrate that appellants are in the practice of making loans to individuals who are not their customers. Thus, nothing about this proffered evidence alters our analysis regarding the nature of appellants' business.

Nor are we persuaded by appellants' argument that we should adopt the definition of "financial institution" contained in the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5312, which specifically includes precious metal dealers. *See* 31 U.S.C. § 5312(a)(2)(N). Although the RFPA explicitly incorporates the broader definition set forth

in the BSA in certain provisions, none of those sections are at issue here. Section 3414 of the RFPA provides that "[f]or purposes of this section and sections 3415 and 3417 of this title insofar as they relate to the operation of [section 3414], the term 'financial institution' has the same meaning as in subsections (a)(2) and (c)(1) of section 5312 of title 31 [the BSA] . . . ." Section 3414 has no application here, however, as it applies only when the government is seeking the customer records of a financial institution in connection with a counterintelligence, terrorism, or Secret Service investigation. Because the RFPA explicitly incorporates the BSA's definition of financial institution only for this narrow purpose, there is no basis on which to conclude that Congress intended it to apply to the type of law enforcement investigation the CFTC is conducting here.

For the foregoing reasons, we hold that appellants do not qualify as "financial institutions" under the RFPA,[9] and

---

[9] The CFTC argues that, even if appellants were covered "financial institutions" under the RFPA, the RFPA's customer notification provisions would still not be applicable because the CFTC's investigation falls within one of the enumerated exceptions to the notification requirement. The exception invoked by the CFTC provides in relevant part: "Nothing in this chapter (except sections 3403, 3417 and 3418 of this title) shall apply when financial records are sought by a Government authority—(A) in connection with a lawful proceeding, investigation, examination, or inspection directed at a financial

(continued...)

the judgment of the district court is therefore AFFIRMED.

---

(...continued)

institution (whether or not such proceeding, investigation, examination, or inspection is also directed at a customer) or at a legal entity which is not a customer . . . ." 12 U.S.C. § 3413(h)(1)(A). However, when the government seeks records pursuant to this section, it must provide certification to the target financial institution indicating that the investigation is directed at the institution. To our knowledge, although the CFTC has offered to provide such a certification to appellants, it has not yet done so. Thus, we do not reach the merits of this argument (nor need we do so, given our determination that the RFPA does not apply to appellants in any event).