In the
# United States Court of Appeals
## For the Seventh Circuit

No. 23-1931

JOHN J. PETR, Trustee for BWGS, LLC,

*Plaintiff-Appellant,*

*v.*

BMO HARRIS BANK N.A. and
SUN CAPITAL PARTNERS VI, L.P.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:22-cv-01742 — **Jane Magnus-Stinson**, *Judge.*

ARGUED JANUARY 19, 2024 — DECIDED MARCH 15, 2024

Before ST. EVE, KIRSCH, and LEE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Acquisition company Sun Capital, through its subsidiary, acquired the financially floundering BWGS, LLC. It financed the acquisition with a loan from BMO Harris that BWGS repaid a month later. Now bankrupt, BWGS asserts that this payment was a constructively fraudulent transfer and seeks to avoid it and recover its value under the United States Bankruptcy Code and Indiana Uniform

Voidable Transactions Act. This appeal raises two issues of first impression in this Circuit. First, whether § 546(e) of the Bankruptcy Code, 11 U.S.C. § 546(e), which shields from avoidance certain transactions made "in connection with a securities contract," extends to transactions involving private securities that do not implicate the national securities clearance market. And second, if so, whether § 546(e) also preempts state law claims seeking similar relief such that a bankruptcy trustee may not bring them under § 544(a) of the Bankruptcy Code. We hold today that the answer to each of these questions is "yes."

## I. Background

Because the district court dismissed this case at the pleadings stage, we recite the facts in the light most favorable to the nonmovant Trustee, accepting as true all the well-pleaded facts in the complaint. *In re Jepson*, 816 F.3d 942, 945 (7th Cir. 2016).

### A. Factual History

Formed as Worm's Way, Inc. in 1987, the debtor, BWGS, LLC ("BWGS")[1] was a wholesale distributor of hydroponic and organic garden products. Beginning in 2015, BWGS's gross profit margin dropped and it incurred net losses each year. At that time, all BWGS's outstanding stock was in an Employee Stock Ownership Plan Trust ("ESOP Trust"). BWGS was thus a privately held company whose stock was never publicly traded.

---

[1] While recognizing that the debtor's name did not change from Worm's Way, Inc. to BWGS, LLC until 2016, for consistency, we refer to the debtor uniformly as BWGS.

In 2016, defendant Sun Capital Partners VI, L.P. ("Sun Capital") targeted BWGS for acquisition. Sun Capital negotiated with the ESOP Trust, and they ultimately reached a stock purchase agreement ("SPA"). Under the SPA, Sun Capital's subsidiary would acquire all stock in BWGS for $37,751,632. Sun Capital then formed BWGS Intermediate Holding, LLC ("Intermediate Holding") to acquire BWGS's stock. The acquisition closed on December 30, 2016, and BWGS thus became a direct, wholly owned subsidiary of Intermediate Holding.

To finance the acquisition, Intermediate Holding entered into a loan authorization agreement with defendant BMO Harris Bank N.A. ("BMO"). Under this agreement, BMO extended Intermediate Holding a loan of about $25.8 million (the "Bridge Loan"). Sun Capital guaranteed the agreement. The day of the closing, BMO transferred these funds to Intermediate Holding, which then transferred them to the ESOP Trust in exchange for BWGS's stock.

On January 27, 2017—less than one month after the acquisition—Sun Capital caused BWGS and Intermediate Holding to enter two credit agreements as joint borrowers. The first was for a $20 million term loan with LBC Credit Agency Services, LLC ("LBC"), under which LBC transferred $19,477,597 to BMO. The second provided for revolving loans of up to $20 million with JP Morgan Chase Bank, N.A. ("JP Morgan"), under which JP Morgan transferred $5 million to BMO. That same day, BWGS transferred an additional $409,706 from its cash on hand to BMO.

BMO accepted these three transfers, totaling $24,887,303 (collectively, "the Transfer"), in full payment of the Bridge Loan. The Transfer thus relieved Intermediate Holding and

Sun Capital of their obligations under the Bridge Loan. BWGS received no value from the Transfer.

The Transfer left BWGS, already in poor financial condition, in dire financial straits. BWGS defaulted repeatedly between 2017 and 2019, and BWGS's creditors ultimately filed an involuntary bankruptcy petition against it under Chapter 7 of the United States Bankruptcy Code. The bankruptcy court entered an order for relief under Chapter 7 on April 24, 2019.

**B. Legal Background and Procedural History**

The Bankruptcy Trustee for BWGS (the "Trustee") filed this action against BMO, Sun Capital, and other unidentified entities in the United States Bankruptcy Court for the Southern District of Indiana. The Trustee's amended complaint seeks to avoid the Transfer and recover its value from either BMO or Sun Capital under Chapter 5 of the United States Bankruptcy Code.

Chapter 5 affords bankruptcy trustees the authority to "se[t] aside certain types of transfers ... and ... recaptur[e] the value of those avoided transfers for the benefit of the estate." *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 370 (2018). Sections 544 through 553 of the Code outline the circumstances under which a trustee may pursue avoidance. *Id.* Here, the Trustee invokes § 544(b)(1), which provides:

> [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1). Section 544(b) thus allows the Trustee to "step into the shoes of a creditor" and "avoid any transfers such a creditor could have avoided" under applicable law. *In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 85 (2d Cir. 2019) (quoting *Univ. Church v. Geltzer*, 463 F.3d 218, 222 n.1 (2d Cir. 2006)).

The applicable law the Trustee relies upon here is the Indiana Uniform Voidable Transactions Act ("IUVTA"). Section 14(a)(2) of the IUVTA provides that a constructively fraudulent transfer is "voidable as to a creditor." Ind. Code § 32-18-2-14(a)(2). Section 17(a) subsequently provides that, "[i]n an action for relief against a transfer," a creditor may obtain, *inter alia*, "[a]voidance of the transfer." Ind. Code § 32-18-2-17(a)(1). Alleging that the Transfer was constructively fraudulent under § 14(a)(2), the Trustee seeks to avoid the Transfer by combining § 544(b) of the Bankruptcy Code with §§ 14(a)(2) and 17(a) of the IUVTA.

The Trustee further seeks to recover the value of the Transfer from either BMO or Sun Capital pursuant to § 550(a) of the Bankruptcy Code and § 18(b)(1) of the IUVTA. Section 550(a) provides, in relevant part:

> [T]o the extent that a transfer is avoided under section 544 … of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from … the initial transferee of such transfer or the entity for whose benefit such transfer was made ….

11 U.S.C. § 550(a)(1). Similarly, § 18(b)(1) of the IUVTA provides: "To the extent that a transfer is avoidable in an action by a creditor under section 17(a)(1) … the creditor may

recover a judgment for the value of the asset transferred" from certain transferees. Ind. Code § 32-18-2-18(b)(1).

Alleging he can avoid the Transfer under § 544(b) via § 17(a), the Trustee contends that he may thereafter recover its value under § 550(a) and § 18(b)(1) from either the original transferee—BMO—or a beneficiary of the transfer—Sun Capital.

BMO and Sun Capital (together, the "Defendants") moved to dismiss the Trustee's claims, arguing that the Transfer is not avoidable because it falls within the safe harbor of § 546(e), which prevents a bankruptcy trustee from undoing certain transfers. As relevant here, the safe harbor provides that "the trustee may not avoid a transfer … made by or to (or for the benefit of) a … financial institution … in connection with a securities contract, as defined in section 741(7) … except under section 548(a)(1)(A) of this title." 11 U.S.C. § 546(e).

The bankruptcy court disagreed. Denying the Defendants' motions, the court found that only the SPA was a "securities contract" and the Transfer was not made "in connection with" the SPA because it lacked a "sufficient material nexus" to it. As an alternative basis for denying the Defendants' motions, the court also held sua sponte that the Trustee's claim to recover the value of the Transfer from Sun Capital under § 18(b)(1) of the IUVTA, brought via the "'strong arm' powers of § 544," did not implicate § 546(e)'s safe harbor. Because § 18(b)(1) provides that a creditor may recover the value of a transfer "[t]o the extent that a transfer is *avoidable* in an action by a creditor," Ind. Code § 32-18-2-18(b)(1) (emphasis added), the bankruptcy court found that it permits the Trustee to recover the value of the Transfer from Sun Capital without actually avoiding the Transfer.

After granting the Defendants leave to file an interlocutory appeal, the United States District Court for the Southern District of Indiana reversed. The district court found that the SPA, Bridge Loan Authorization Agreement, and Sun Capital Guaranty all qualified as securities contracts under the safe harbor and the Transfer was made "in connection with" these securities contracts. Accordingly, the district court held that § 546(e)'s safe harbor barred the Trustee's claims.

Turning to the bankruptcy court's alternative ruling, the district court first rejected as waived the Trustee's newfound argument that the safe harbor does not apply to an IUVTA § 18(b)(1) claim against Sun Capital brought pursuant to the strong-arm power of § 544(a) of the Bankruptcy Code. The Trustee had not brought a claim under § 544(a) in the bankruptcy court and could not do so for the first time in the district court on appeal. Finally, the district court found that, even if the Trustee had asserted freestanding claims under § 18(b)(1), § 546(e)'s safe harbor nevertheless preempted those claims.

Accordingly, the district court remanded the case to the bankruptcy court with instructions to enter a dismissal with prejudice. The Trustee appeals.

## II. Analysis

"We review the judgment of the district court using the same standard of review with which the district court reviewed the bankruptcy court's ruling." *In re Sheehan*, 48 F.4th 513, 520 (7th Cir. 2022). "Like the district court, we review a bankruptcy court's factual findings for clear error and its legal conclusions de novo." *In re Miss. Valley Livestock, Inc.*, 745 F.3d 299, 302 (7th Cir. 2014).

On appeal, the Trustee contends that the district court erred in directing the dismissal of his complaint based on the § 546(e) safe harbor. The crux of the instant appeal thus centers on whether § 546(e)'s safe harbor precludes the Trustee's claims to avoid and recover the value of the Transfer. In resolving this dispute, we must consider two ancillary questions. First, does § 546(e) apply to the Trustee's claims to avoid the Transfer here? And second, if so, can the Trustee nevertheless circumvent § 546(e) and proceed with claims to recover the value of the Transfer under § 544(a) of the Bankruptcy Code and § 18(b)(1) of the IUVTA? We address each question in turn.

### A. Section 546(e)'s Safe Harbor Applies to the Transfer

The § 546(e) safe harbor precludes a bankruptcy trustee from avoiding a transfer "made by or to … [a] financial institution … in connection with a securities contract." Relying on legislative history, the Trustee contends that § 546(e) applies only to transactions that implicate the national system for the clearance and settlement of publicly held securities. He reasons that Congress enacted § 546(e) to insulate the nation's financial markets from instability generated by the avoidance of public securities transactions, and undoing private transactions does not advance that purpose. Thus, he argues that Congress did not intend to shield the Transfer here, which involved the sale of only privately held stock, from avoidance under § 546(e)'s safe harbor.

In determining whether § 546(e)'s prohibition on the avoidance of transfers made "in connection with a securities contract" applies to private securities transactions, we begin, as we must, with the statutory text. *Nielen-Thomas v. Concorde Inv. Servs., LLC*, 914 F.3d 524, 528 (7th Cir. 2019). We read the

statute as a whole and give words "'their ordinary and natural meaning' in the absence of a specific statutory definition." *Id.* (quoting *CFTC v. Worth Bullion Grp., Inc.*, 717 F.3d 545, 550 (7th Cir. 2013)). If the statutory text is clear and unambiguous, our inquiry ends. *Id.*

Section 546(e) provides:

Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title … or that is a transfer made by or to (or for the benefit of) a … financial institution … in connection with a securities contract, as defined in section 741(7) ….

The Trustee insists that this court has already held § 546(e) ambiguous and found it necessary to consult legislative history in construing the provision. *See FTI Consulting, Inc. v. Merit Mgmt. Grp.*, 830 F.3d 690 (7th Cir. 2016).[2] In *FTI Consulting*, we held no such thing. Instead, in *FTI Consulting*, we considered the discrete question of "whether the section 546(e) safe harbor protects transfers that are simply conducted *through* financial institutions (or the other entities named in section 546(e)), where the entity is neither the debtor nor the transferee but only the conduit." *Id.* at 691. In resolving that question, we noted at the outset that there was "no question that the transfer at issue [was] either a 'settlement payment' or a payment made 'in connection with a securities contract'"

---

[2] At oral argument, counsel for the Trustee walked back this argument.

for purposes of the safe harbor. *Id.* at 692. Thus, far from holding that § 546(e) as a whole is ambiguous, we were untroubled by the meaning of the portion of that provision at issue here: "in connection with a securities contract."

Indeed, it was only *after* we held the phrases "by or to" and "for the benefit of" in § 546(e) were ambiguous that we "turn[ed] to the statute's purpose and context for further guidance." *Id.* at 693. And even then, we did not come close to holding that § 546(e), or any portion thereof, applies only to securities transactions implicating the national securities clearance system. *See id.* at 697 (holding narrowly that "section 546(e) does not provide a safe harbor against avoidance of transfers between non-named entities where a named entity acts as a conduit"). Moreover, in affirming our *FTI Consulting* decision, the Supreme Court in *Merit Management* suggested that these disputed provisions are unambiguous and thus resort to legislative history is unnecessary. *See* 583 U.S. at 385–86 ("Even if this were the type of case in which the Court would consider statutory purpose, here Merit fails to support its purposivist arguments. In fact, its perceived purpose is actually contradicted by the plain language of the safe harbor…. For these reasons, we need not deviate from the plain meaning of the language used in § 546(e)." (citation omitted)).

Turning to the relevant portion of § 546(e) here, the parties do not dispute that the Transfer to BMO was "made to a financial institution." (ellipses omitted). We must determine whether the Transfer was made "in connection with a securities contract" within the meaning of § 546(e). In making this determination, we turn to legislative history and other canons of statutory interpretation only if this language is ambiguous. *See Nielen-Thomas*, 914 F.3d at 528.

### 1. "Securities Contract"

We first consider the term "securities contract" as used in § 546(e). This court has twice cited the definition of "securities contract" as it applies to § 546(e) with approval. *Peterson v. Somers Dublin Ltd.*, 729 F.3d 741, 750 (7th Cir. 2013); *Grede v. FCStone, LLC*, 746 F.3d 244, 252 (7th Cir. 2014). Indeed, the Trustee identifies no ambiguities in the plain text of the term or its definitions, and we can conceive of none. "Securities contract" as used in § 546(e) is unambiguous.

Moreover, nothing in the plain language of § 546(e) excludes private contracts not implicating the national securities clearance system from the definition of "securities contract." Section 546(e) defines "securities contract" by reference to 11 U.S.C. § 741(7) of the Bankruptcy Code. As we have recognized, § 741(7) defines the term "very broadly," *Grede*, 746 F.3d at 252, containing eleven sub-definitions. And not one of these eleven sub-definitions contains any indication that it is limited to contracts implicating only publicly held securities. Indeed, the first sub-definition "provides that a 'securities contract' is a contract for the purchase or sale of a security, and § 101(49)(A)(ii) says that security includes stock." *Peterson*, 729 F.3d at 750. As commonly understood, "stock" is a broad term, covering shares in private and public companies. *See* STOCK, Black's Law Dictionary (11th ed. 2019) (defining "stock" as "[t]he capital or principal fund raised by a corporation through subscribers' contributions or the sale of shares" and "[a] proportional part of a corporation's capital represented by the number of equal units (or shares) owned, and granting the holder the right to participate in the company's general management and to share in its net profits or earnings").

Nor are we persuaded that the location of the definition of "securities contract" within the section of the Bankruptcy Code governing stockbroker liquidations somehow grafts a public-securities requirement onto the otherwise-clear meaning of the term. To the contrary, the "General Provisions" sub-chapter of the Code provides that "a definition, contained in a section of this title that refers to another section of this title, does not, for the purpose of such reference, affect the meaning of a term used in such other section." 11 U.S.C. § 102(8). Congress thus made it clear that it did not intend cross-references between sections of the Code to impact the meaning of terms used in those sections.

The decisions of our sister circuits support our conclusion that nothing in the definition of "securities contract" or the text of § 546(e) restricts the term to public securities. *See, e.g.*, *In re Plassein Int'l Corp.*, 590 F.3d 252, 258 (3d Cir. 2009) (rejecting the notion that "settlement payments" as contemplated by § 546(e) "must travel through the settlement system"); *Contemp. Indus. Corp. v. Frost*, 564 F.3d 981, 986 (8th Cir. 2009) ("Nothing in the relevant statutory language suggests Congress intended to exclude these payments from the statutory definition of 'settlement payment' simply because the stock at issue was privately held."), *abrogated in part by Merit Mgmt. Grp.*, 583 U.S. 366; *In re QSI Holdings, Inc.*, 571 F.3d 545, 547 (6th Cir. 2009) ("[Section] 546(e) is not limited to publicly traded securities but also extends to transactions, such as the leveraged buyout at issue here, involving privately held securities."), *abrogated in part by Merit Mgmt. Grp.*, 583 U.S. 366; *In re Olympic Nat. Gas Co.*, 294 F.3d 737, 742 n.5 (5th Cir. 2002) ("By including references to both the commodities and the securities markets, it seems clear that Congress meant to

exclude from the stay and [§ 546(e)] avoidance provisions both on-market, and the corresponding off-market, transactions.").

Accordingly, we hold that the term "securities contract" as used in § 546(e) unambiguously includes contracts involving privately held securities. Applying the term's unambiguous definition here, we have little trouble agreeing with the district court that the SPA, Bridge Loan Authorization Agreement, and Sun Capital Guaranty are "securities contract[s]" as defined in § 741(7).[3]

Turning first to the SPA. We agree with both the bankruptcy court and district court that the SPA falls squarely within § 741(7)'s definition of a "securities contract" as "a contract for the purchase … of a security." § 741(7)(A)(i). The amended complaint alleges that the SPA was "the transaction by which Intermediate Holding acquired the stock of BWGS." Because a "security" includes "stock," the Trustee's own allegations establish that the SPA was a contract for the purchase of a security, and therefore a securities contract. *See* 11 U.S.C. § 101(49)(A)(ii); *Peterson*, 729 F.3d at 750.

The Bridge Loan Authorization Agreement also comfortably falls within the definition of "securities contract." The Trustee alleges that "[t]o provide a portion of the $37,751,632 due [to] the ESOP Trust at closing, [BMO] agreed, pursuant to

_____

[3] The Defendants also argue that the two loan agreements BWGS entered into with LBC and JP Morgan constitute securities contracts for purposes of § 546(e). Because we find that the other three agreements were securities contracts and the Transfer was made in connection with those agreements, we need not consider whether the remaining loan agreements were also securities contracts for purposes of § 546(e).

a [Bridge] Loan Authorization Agreement … between Intermediate Holding and BMO … to make a bridge loan to Intermediate Holding of $25.8 million." By his own words, the Trustee concedes that BMO extended credit for the clearance of a securities transaction—i.e., the sale of all stock in BWGS. This places the Agreement within the definition of "securities contract" set out in § 741(7)(A)(v): "any extension of credit for the clearance or settlement of securities transactions."

Finally, the Trustee alleges that the Guaranty was a "credit enhancement in some manner to [BMO] with respect to the Bridge Loan." This allegation closely mirrors the definition of "securities contract" under § 741(7)(A)(xi) as "any … credit enhancement related to any agreement or transaction referred to in this subparagraph, including any guarantee … to a … financial institution … in connection with any agreement or transaction referred to in this subparagraph." As the Sun Capital Guaranty was a credit enhancement for the Bridge Loan Authorization Agreement—a securities contract—it was a securities contract itself.

Consistent with its "extraordinary breadth," *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 417 (2d Cir. 2014), section 741(7) contains a catch-all sub-definition of "securities contract." That definition provides that "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph" is a securities contract. § 741(7)(A)(vii). Even if the SPA, Bridge Loan Authorization Agreement, and Sun Capital Guaranty did not fall within the narrower sub-definitions we just described, they are, at minimum, agreements that are *similar to* those defined in those sub-definitions. And that is enough.

**2. "In connection with"**

That brings us to the "in connection with" requirement of § 546(e). We have previously rejected a bankruptcy trustee's invitation to consult legislative history in construing the phrase "in connection with." *See Peterson*, 729 F.3d at 749 ("Ambiguity sometimes justifies resort to legislative history, but it is used to decipher the ambiguous language, not to replace it."). Instead, we looked to decisions such as *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006), and *United States v. O'Hagan*, 521 U.S. 642 (1997), which discuss the "in connection with" requirement of a different securities fraud statute. *See Peterson*, 729 F.3d at 749. Finding that these decisions establish that § 546(e)'s "in connection with" requirement "is more than comprehensive enough to cover" the transaction at issue there, we did not adopt a precise definition of the requirement.

Just as in *Peterson*, we find it unnecessary to define the outer limits of the "in connection with" requirement here. The broad construction of the phrase, as recognized in *Peterson*, *Dabit*, and *O'Hagan*, makes clear that the Transfer here was made "in connection with" the relevant securities contracts.

Indeed, it is difficult to imagine how the Transfer was not made "in connection with" the securities contracts here. The Transfer fully satisfied the Bridge Loan—a securities contract—and extinguished Sun Capital's obligations under the Guaranty—another securities contract. And these two securities contracts effectuated the fulfillment of the SPA—yet another securities contract.

That the Transfer occurred a little less than a month after the SPA's execution does not change our view. Section 546(e)

contains no temporal requirement, and we see no reason to impose one. Of course, a more temporally attenuated transaction is less likely to have been "made in connection with" a given securities contract. But the passage of time, however long, does not categorically eliminate any connection. And here, nearly $25 million—an amount that undoubtedly takes time to plan and arrange—changed hands in under a month. That gap does not break the connection between the Transfer and the SPA.

* * *

In sum, we hold that the SPA, Bridge Loan Authorization Agreement, and Sun Capital Guaranty are securities contracts, the Transfer was made in connection with these securities contracts, and thus § 546(e)'s safe harbor applies and precludes the Trustee from avoiding the Transfer under § 544(b) of the Bankruptcy Code.

## B. The Trustee Cannot Advance Successful Claims Under § 544(a) of the Bankruptcy Code

The Trustee next seeks to amend his complaint to add a claim under § 544(a) of the Bankruptcy Code to recover the value of the Transfer from Sun Capital. Relying on the bankruptcy court's alternative holding, the Trustee now argues for the first time that even if § 546(e)'s safe harbor precludes his claims to *avoid* the Transfer, a claim under § 544(a) would allow him to recover the value of the *avoidable* Transfer without actually avoiding it.

Section 544(a) provides: "The trustee shall have … the *rights and powers* of, *or* may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by" certain creditors. 11 U.S.C. § 544(a) (emphasis

added). The Trustee thus argues that a claim under § 544(a) would empower him to exercise the "rights and powers" afforded a creditor—specifically, those set out in §§ 14(a)(2), 17(a), and 18(b)(1) of the IUVTA.

Recall that § 14(a)(2) provides that a constructively fraudulent transfer "is voidable as to a creditor." Section 17(a)(1) provides that a creditor may seek "avoidance" of such a transfer "to the extent necessary to satisfy the creditor's claim." Finally, § 18(b)(1) provides that, "[t]o the extent that a transfer is *avoidable* in an action by a creditor under section 17(a)(1) … the creditor may recover judgment for the value of the asset transferred" against certain creditors including, as relevant here, "the person for whose benefit the transfer was made." (emphasis added).

In advancing a claim under § 544(a), the Trustee would allege that the Transfer was constructively fraudulent under § 14(a)(2) and therefore *avoidable* under § 17(a)(1). Exercising the "rights and powers" afforded a creditor by this statutory scheme via § 544(a), the Trustee would thus seek to pursue a judgment for the value of this *avoidable* Transfer against Sun Capital[4]—the alleged beneficiary of the Transfer—under § 18(b)(1). The Trustee contends that § 546(e)'s prohibition on the *avoidance* of a transfer would not prohibit him from seeking such a judgment because he need not actually *avoid* the *avoidable* Transfer.

The parties spill much ink over whether the Trustee waived his right to advance such a claim under § 544(a) by

---

[4] The parties agree that the Trustee could not proceed with a claim under this theory against BMO, which was not a beneficiary of the Transfer.

failing to raise it before the bankruptcy and district courts. We need not address this issue here. Even if the Trustee did not waive his § 544(a) claim, amending the complaint to add it would be futile. Through this claim, the Trustee is attempting to invoke state-law IUVTA provisions to obtain the same relief that § 546(e) otherwise precludes. Section 546(e) accordingly preempts the claim.

Under the Supremacy Clause of the Constitution, federal law prevails over state law. U.S. Const. art. VI, cl. 2. "Under this principle, Congress has the power to preempt state law." *Arizona v. United States*, 567 U.S. 387, 399 (2012). This "preclude[es] courts from 'giv[ing] effect to state laws that conflict with federal laws.'" *Nationwide Freight Sys., Inc. v. Ill. Com. Comm'n*, 784 F.3d 367, 372 (7th Cir. 2015) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015)). "Preemption can take on three different forms: express preemption, field preemption, and conflict preemption." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 576 (7th Cir. 2012) (quoting *Aux Sable Liquid Prods. v. Murphy*, 526 F.3d 1028, 1033 (7th Cir. 2008)).

The Defendants concede that neither § 546(e) nor any other statute expressly preempts the Trustee's proposed IUVTA (via § 544(a)) claim. But they argue the doctrine of "conflict" or "obstacle" preemption nevertheless bars it. Conflict preemption applies to "cases where compliance with both federal and state regulations is a physical impossibility and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *McHenry Cnty. v. Kwame Raoul*, 44 F.4th 581, 591 (7th Cir. 2022) (quotation omitted). The Defendants do not assert any physical impossibility, so we

consider whether allowing the Trustee to proceed with his proposed IUVTA claim under § 544(a) obstructs congressional purposes. *Id.* "That inquiry 'is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects.'" *Id.* (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)).

Two other circuits have considered the preemptive effect of § 546(e) on state law claims. Both held that § 546(e) preempts state law claims seeking to recover the value of transfers that the safe harbor shields. *In re Tribune Co.*, 946 F.3d at 83, 90–92; *Contemp. Indus. Corp.*, 564 F.3d at 988. While we have yet to directly consider the preemptive effect of § 546(e) on state law claims, we have suggested that we would fall in line with our sister circuits on this issue. *See Grede*, 746 F.3d at 259. In *Grede*, we found a trustee's state law unjust enrichment claim preempted because "[t]o allow an unjust enrichment claim in this context would allow the trustee or a creditor to make an end run around the bankruptcy code's allocation of assets and losses, frustrating the administration of the bankruptcy estate." *Id.* And although we did not indicate which provision of the Bankruptcy Code preempted the unjust enrichment claim, we cited the Eighth Circuit's decision in *Contemporary Industries* as support for this proposition. *See id. Grede* thus implies that § 546(e) preempts state law claims seeking the same relief that its safe harbor otherwise prohibits.

The decisions of our sister circuits persuade us that § 546(e) preempts state law claims to recover the value of transfers shielded by the safe harbor. Indeed, to allow a bankruptcy trustee to recover the otherwise-unavoidable payments "would render the § 546(e) exemption meaningless,

and would wholly frustrate the purpose behind that section." *Contemp. Indus. Corp.*, 564 F.3d at 988.

While the Trustee claims that he seeks different relief under the IUVTA and § 544(a)—namely, recovery of the value of the Transfer from Sun Capital—we are not persuaded. The relief the Trustee seeks, while different in name, is functionally the same as the avoidance remedy the safe harbor prohibits. The Trustee seeks the prohibited relief provided by §§ 544(b) and 550(a)—to recover the value of the safe-harbored Transfer from transfer-beneficiary Sun Capital.

As the Supreme Court described the "general avoiding powers of a bankruptcy trustee" in *Merit Management*:

> Chapter 5 of the Bankruptcy Code affords bankruptcy trustees the authority to set aside certain types of transfers and recapture the value of those avoided transfers for the benefit of the estate. These avoiding powers help implement the core principles of bankruptcy. For example, some deter the race of diligence of creditors to dismember the debtor before bankruptcy and promote equality of distribution. Others set aside transfers that unfairly or improperly deplete assets or dilute the claims against those assets.

583 U.S. at 370 (cleaned up). Thus, the avoidance power recognized under the Bankruptcy Code is part and parcel of the power to recover the value of the property for the bankruptcy estate. Without the recovery of transferred property, the avoidance power is essentially meaningless. Allowing the Trustee to obtain the part and not the parcel by dressing up his claim as an IUVTA claim brought under § 544(a) poses an

insurmountable obstacle to the safe harbor—an obstacle that the doctrine of conflict preemption does not permit.

Moreover, the Trustee's argument ignores the Bankruptcy Code's framework and the interplay among §§ 546(e), 544, and 550(a). Although § 544(a) allows the Trustee to exercise the "rights and powers" of a hypothetical creditor under state law, it is § 550(a) that provides the trustee with the recovery remedy. Section 550(a) provides, "to the extent that a transfer is *avoided* under section 544 … the trustee may recover, for the benefit of the estate, the property transferred, or … the value of such property" from either "the initial transferee of such transfer or the entity for whose benefit such transfer was made." § 550(a)(1) (emphasis added). Thus, to enjoy § 550's recovery remedy, a trustee must first avoid the transfer under § 544. And where, as here, § 546(e) renders a particular transfer unavoidable under § 544, then it also precludes recovery for that transfer's value under § 550(a).

Accordingly, we hold that § 546(e) preempts the Trustee's proffered IUVTA claim to the extent that he could otherwise bring it under § 544(a). To hold differently would render § 546(e) meaningless. As such, leave to amend would be futile, and the district court did not err in directing the bankruptcy court to dismiss the Trustee's complaint with prejudice.

### III. Conclusion

The judgment of the district court is

AFFIRMED.